[No. G035579. Fourth Dist., Div. Three. Dec. 24, 2007.]

CINDY HAILEY et al., Plaintiffs and Appellants, v.
CALIFORNIA PHYSICIANS' SERVICE, Defendant and Respondent.

454

456

## COUNSEL

Jeffrey L. Garland and Michael G. Nutter for Plaintiffs and Appellants.

Amy L. Dobberteen, Patricia T. Sturdevant and Lotte Colbert for California Department of Managed Health Care as Amicus Curiae on behalf of Plaintiffs and Appellants.

Arkin & Glovsky and Sharon J. Arkin for United Policyholders as Amicus Curiae on behalf of Plaintiffs and Appellants.

Hooper, Lundy & Bookman, Daron L. Tooch, Glenn E. Solomon and Suzanne S. Chou for California Medical Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

Shernoff Bidart & Darras, William M. Shernoff and Joel A. Cohen as Amici Curiae on behalf of Plaintiffs and Appellants.

Gary Cohen and Andrea Rosen for California Department of Insurance as Amicus Curiae on behalf of Plaintiffs and Appellants.

Barger & Wolen, John M. LeBlanc, Andrew S. Williams; Mayer, Brown, Rowe & Maw, Andrew L. Frey and Donald M. Falk for Defendant and Respondent.

Manatt, Phelps & Phillips, Gregory N. Pimstone and Joanna S. McCallum for California Life and Health Insurance Companies as Amicus Curiae on behalf of Defendant and Respondent.

Epstein Becker & Green, William A. Helvestine, Damian D. Capozzola and Rhea G. Mariano for California Association of Health Plans as Amicus Curiae on behalf of Defendant and Respondent.

## OPINION

**ARONSON, J.**—Plaintiffs Cindy and Steve Hailey challenge a judgment entered after the trial court (1) sustained demurrers to their cause of action for intentional infliction of emotional distress without leave to amend, (2) granted summary judgment in favor of defendant California Physicians' Service, doing business as Blue Shield of California (Blue Shield) on the Haileys' claims for breach of contract and breach of the covenant of good faith and fair dealing, and (3) awarded $104,194.12 in damages to Blue Shield on its cross-complaint for rescission of the health services contract it had previously agreed to provide the Haileys.

The Haileys contend, inter alia, Health and Safety Code section 1389.3[1] precludes Blue Shield from rescinding unless it can prove the Haileys willfully misrepresented the condition of Steve's[2] health at the time they applied for coverage. Because evidence of whether the Haileys' misrepresentations were willful presents a triable issue of fact, they contend the trial court erred in granting summary judgment. They also contend Blue Shield's rescission of their health services plan constituted extreme and outrageous behavior sufficient to state a cause of action for intentional infliction of emotional distress.

We conclude section 1389.3 precludes a health services plan from rescinding a contract for a material misrepresentation or omission unless the plan can demonstrate (1) the misrepresentation or omission was willful, or (2) it had made reasonable efforts to ensure the subscriber's application was accurate and complete as part of the precontract underwriting process. Because both of these issues turn on disputed facts, the trial court's summary

---

[1] All statutory references are to the Health and Safety Code unless otherwise noted.

[2] We refer to the Haileys by their first names for clarity and ease of reference, and intend no disrespect. (See *In re Marriage of Olsen* (1994) 24 Cal.App.4th 1702, 1704, fn. 1 [30 Cal.Rptr.2d 306].)

judgment ruling cannot stand. We also conclude a triable issue of fact exists whether Blue Shield engaged in bad faith, and that the Haileys adequately alleged a cause of action for intentional infliction of emotional distress. We therefore reverse the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

Blue Shield is a health care service plan licensed and regulated by the Department of Managed Health Care. (§ 1341, subd. (a).) To obtain coverage under a Blue Shield individual health contract, applicants must qualify based on their medical and health history. Accordingly, applicants must complete an application requesting specific information regarding their medical history. In signing the application, the applicant attests to the accuracy and completeness of the responses, and acknowledges the plan may revoke coverage if the applicant furnishes false or incomplete information.

Blue Shield underwrites all applicants for individual coverage by reviewing and analyzing the information contained in the applications submitted. According to the declaration of Margie Macale, a Blue Shield medical underwriter, an applicant's medical history and current medical conditions are assigned a point value. Some conditions are sufficient by themselves to warrant denial of coverage, while others may prompt a postponement in the process to allow Blue Shield to obtain additional information. Based on the point values, Blue Shield grants coverage, grants coverage at an increased rate, or denies coverage.

When Cindy started a new job in late 2000, she carried health insurance covering her family from a previous employer through COBRA.[3] Although she believed she could have obtained health insurance from her new employer, the new insurance did not cover the family's doctor. Learning Blue Shield would cover her family's physician, she contacted Timothy Patrick, an insurance agent, who sent her an application. According to Cindy, she believed she provided all of the information requested on the application. Nonetheless, she mistakenly believed the form sought information relating only to her health, and not that of her husband, Steve, or their son. Although she noted on the application matters concerning her own health, she omitted any health information regarding her husband or son. She also incorrectly listed Steve's weight as 240 pounds instead of his actual weight of 285 pounds.

---

[3] The Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) mandates that certain employees and their dependents be offered the option of paying premiums to continue medical coverage for a limited time period after the termination of coverage under a group health plan. (29 U.S.C. §§ 1161–1167; 42 U.S.C. §§ 300bb-1 through 300bb-8.)

Cindy sent the completed application to Patrick, who, after receiving it, asked Cindy some questions regarding her health history, but did not go over any of the application's questions and did not inform her the application's health questions also applied to Steve and their son. Although Steve signed the application, he did not read it. Based on the information provided in the application, Blue Shield extended coverage to Cindy and her family at its "premier" or best rate beginning December 15, 2000.

In February 2001, Steve was admitted to the hospital for stomach problems. Because of this development, on February 8, 2001, Blue Shield's medical management department referred the Haileys' contract to Judith Crary of its "Underwriting Investigation Unit" which, as Crary describes in her declaration, "investigates potential fraud by Blue Shield subscribers." In its probe, Blue Shield obtained Steve's medical records, which revealed a history of undisclosed health issues, including obesity, hypertension, difficulty swallowing, and gastroesophageal reflux disease. Based on the information obtained from Steve's medical providers and Blue Shield's underwriting guidelines, Crary determined the Haileys intentionally misrepresented and concealed Steve's medical information.

On March 19, 2001, an automobile accident left Steve completely disabled. He remained hospitalized until May 31, 2001, when he was released and sent home with instructions for additional home nursing care and physical therapy. Before his discharge, Blue Shield authorized health care providers to provide surgery, treatment, care, and physical therapy in an amount exceeding $457,000.

On June 1, 2001, Blue Shield sent the Haileys a letter informing them their health insurance coverage had been cancelled retroactively to December 15, 2000, the date Blue Shield issued the policy. Blue Shield based its cancellation on the Haileys' failure to disclose medical information Blue Shield had received from Los Alamitos Medical Center, which disclosed that in October 2000, Steve had been seen "for dysphagia, stricture/stenosis of the esophagus, essential hypertension, and a reported weight of 285 lbs." The letter noted the total amount of claims submitted during the period of February 6, 2001, to May 14, 2001, was $457,163.30. The letter demanded the Haileys pay Blue Shield $60,777.10, the difference between the amount Blue Shield had paid for Steve's medical care, and the premiums the Haileys had paid for their health insurance.

After Blue Shield cancelled the policy, the Haileys could no longer afford nursing care or physical therapy for Steve. In addition, third party medical providers demanded the Haileys pay for medical care previously provided. Blue Shield's rescission of the health care plan contract caused Steve delays

in obtaining necessary medical care. Steve subsequently lost the use of his bladder, which he contends is permanently nonfunctional. Steve also asserts the lack of physical therapy has impaired his ability to walk, increased his pain, and resulted in further surgery and medication.

The Haileys sued Blue Shield, alleging in their second amended complaint causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, and intentional infliction of emotional distress. Blue Shield demurred to the intentional infliction of emotional distress cause of action, which the trial court sustained without leave to amend. Blue Shield also filed a cross-complaint seeking a declaration it legally rescinded its health care contract with the Haileys and was entitled to recover the money it spent on Steve's medical care before the rescission.

The trial court granted Blue Shield's summary judgment motion on the Haileys' complaint, determining that the Haileys' misrepresentations and omissions justified rescission, and entered judgment for Blue Shield on its cross-complaint in the amount of $104,194.12. The Haileys appealed and later filed a petition for writ of supersedeas to stop Blue Shield from executing on its judgment. We granted a temporary stay of execution pending resolution of this appeal, and invited amicus curiae briefs from various organizations.

II

STANDARD OF REVIEW

We review a summary judgment motion de novo to determine whether there is a triable issue as to any material fact and whether the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A defendant moving for summary judgment must show either that the plaintiff cannot establish one or more elements of the cause of action or that there is a complete defense. The defendant must "show that the plaintiff cannot establish at least one element of the cause of action . . . . [Fn. omitted.] [T]he defendant need not himself conclusively negate any such element . . . ." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853 [107 Cal.Rptr.2d 841, 24 P.3d 493].) If the defendant makes this showing, the burden shifts to the plaintiff to show a triable issue of fact as to that cause of action or defense. (Code Civ. Proc., § 437c, subd. (p)(2).) We must view the evidence in the light most favorable to plaintiffs as the losing parties. This means liberally construing their evidentiary submissions, strictly scrutinizing defendant's evidence and resolving any evidentiary doubts or ambiguities in plaintiffs' favor. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 [12 Cal.Rptr.3d 615, 88 P.3d 517].)

We also review de novo the trial court's order sustaining the demurrer. (*Bardin v. DaimlerChrysler Corp.* (2006) 136 Cal.App.4th 1255, 1263 [39 Cal.Rptr.3d 634].) In doing so, we assume the truth of all properly pleaded facts and consider any judicially noticed documents. (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126 [119 Cal.Rptr.2d 709, 45 P.3d 1171].) We give the complaint a reasonable interpretation and determine whether it states facts sufficient to constitute a cause of action under any legal theory. (*Ibid.*) We review denial of leave to amend for abuse of discretion. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

### III

#### Discussion

A. *A Triable Issue of Fact Exists Whether the Haileys Willfully Misrepresented Steve's Medical History Presents a Triable Issue of Fact*

■ Blue Shield is a health care service plan operating under the Knox-Keene Health Care Service Plan Act of 1975 (Knox-Keene Act), codified in section 1340 et seq. The purpose of the Knox-Keene Act is "to promote the delivery and the quality of health and medical care to the people of the State of California who enroll in, or subscribe for the services rendered by, a health care service plan or specialized health care service plan . . . ." (§ 1342.) The act seeks to "ensure the best possible health care for the public at the lowest possible cost by transferring the financial risk of health care from patients to providers." (§ 1342, subd. (d).)

To prevent providers from shifting the financial risk of health care back to the subscribers, the Legislature in 1993 enacted section 1389.3 as part of the Health Insurance Access and Equity Act. (Stats. 1993, ch. 1210, § 3, p. 6939.) Section 1389.3 provides: "No health care service plan shall engage in the practice of postclaims underwriting. For purposes of this section, 'postclaims underwriting' means the rescinding, canceling, or limiting of a plan contract due to the plan's failure to complete medical underwriting and resolve all reasonable questions arising from written information submitted on or with an application before issuing the plan contract. This section shall not limit a plan's remedies upon a showing of willful misrepresentation."

Although the parties interpret section 1389.3 differently,[4] the import of section 1389.3's last sentence is unmistakable: the provision does not affect a

---

[4] In urging their own interpretations of section 1389.3, Blue Shield and amicus curiae Department of Managed Health Care and William Shernoff have requested we take judicial notice of certain documents, falling into four categories: (1) section 1389.3's legislative history, (2) acts taken by the Department of Managed Health Care, (3) court proceedings in another case, and (4) partial transcripts of depositions taken of Blue Shield personnel in another case.

health care service plan's ability to rescind coverage if the subscriber willfully misrepresented his or her health condition in applying for plan coverage. Blue Shield contends the evidence conclusively demonstrates the Haileys willfully misrepresented Steve's medical history, thus providing a basis for upholding the judgment without further analysis. We disagree. Although Cindy admittedly knew most of Steve's medical history when she filled out the application, she stated in her declaration that she believed the form sought only her health information, and not that of Steve or their son. Cindy's explanation for omission of Steve's information is not patently unbelievable.

For example, part 2 of the application form instructs: "List applicant and all family members you wish to cover." Implicit in this instruction is that Blue Shield did not consider family members as coapplicants for insurance. Part 3 of the application, however, requests medical information for "you or any applying family member . . . ." Moreover, the medical information checklist in part 3 does not provide separate questions for each family member, but requires the applicant to answer each question as to herself and each family member. The form, although understandable upon close examination and reflection, is no model of clarity, and lends credence to Cindy's explanation of her omission of Steve's health information. Her belief that Steve's medical information was unnecessary in obtaining health insurance also negates an inference that her understatement of Steve's weight on the application was willful. Similarly, Steve's misplaced reliance on Cindy to accurately complete the application also negates an inference of willfulness. Accordingly, we conclude the Haileys have demonstrated a triable issue of fact whether they willfully misrepresented Steve's medical history.

Blue Shield asserts this triable issue is immaterial because even if Cindy negligently omitted the information it still had the right to rescind as a matter of law. In testing this assertion in our analysis below, we presume the Haileys' omissions were inadvertent and not willful.

---

We grant the request of the Department of Managed Health Care, which includes documents in the first two categories, in its entirety. (See Evid. Code, § 452.) We grant Blue Shield's request as to documents pertaining to legislative history, but deny the request as to documents which fall in the third category, because they are irrelevant. (See *Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 295, fn. 21 [46 Cal.Rptr.3d 638, 139 P.3d 30] ["reviewing court need not take judicial notice of irrelevant court records"].) We also deny each of Shernoff's requests, which seek judicial notice of documents falling into the fourth category, because they are also irrelevant. (*Ibid.*)

B. *Whether Blue Shield Engaged in Postclaims Underwriting Presents a Triable Issue of Fact*

### 1. *The Problem of Postclaims Underwriting*

■ " 'Underwriting' is a label commonly applied to the process, fundamental to the concept of insurance, of deciding which risks to insure and which to reject in order to spread losses over risks in an economically feasible way." (*Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700, 726 [113 Cal.Rptr.2d 399].) In essence, postclaims underwriting occurs when an insurer " 'wait[s] until a claim has been filed to obtain information and make underwriting decisions which should have been made when the application [for insurance] was made, not after the policy was issued.' [Fn. omitted.] In other words, the insurer does not assess an insured's eligibility for insurance, according to the risk he presents, until after insurance has been purchased and a claim has been made. [Fn. omitted.] Although the insurer may ask an applicant for some underwriting information before it issues the policy, it will not follow up on that information until after a significant claim arises. Only after a claim has arisen will the insurer examine the application and request additional information to see whether the applicant could have been excluded from coverage. [Fn. omitted.] [¶] An insurer relying upon post claim underwriting, 'instead of looking to pay the claim . . . look[s] for all the things in the application that [it] might be able to dig up . . . to rescind the policy.' " (Cady & Gates, *Post Claim Underwriting* (2000) 102 W.Va. L.Rev. 809, 813 (hereafter Cady & Gates).) Indeed, "given sufficient impetus—such as chronic illness—it is likely that any health insurer will be able to find some detail within an insured's medical history that, post hoc, amounts to misrepresentation." (*Id.* at p. 858.)

■ The harm from postclaims underwriting is manifest. As one court observed: "An insurer has an obligation to its insureds to do its underwriting at the time a policy application is made, not after a claim is filed. It is patently unfair for a claimant to obtain a policy, pay his premiums and operate under the assumption that he is insured against a specified risk, only to learn *after* he submits a claim that he is *not* insured, and, therefore, cannot obtain any other policy to cover the loss. The insurer controls when the underwriting occurs. . . . If the insured is not an acceptable risk, the application should [be] denied up front, not after a policy is issued. This allows the proposed insured to seek other coverage with another company since no company will insure an individual who has suffered serious illness or injury." (*Lewis v. Equity Nat. Life Ins. Co.* (Miss. 1994) 637 So.2d 183, 188–189, original italics.)

In the present case, the record demonstrates Blue Shield conducted an extensive investigation into Steve Hailey's medical history after learning of Steve's hospitalization for intestinal ailments. In contrast, Blue Shield apparently did little or no investigation into whether the medical information Cindy provided on the application was accurate. Instead, Blue Shield performed its risk assessment on the assumption the application contained no errors. Upon receiving a hospitalization claim under the plan, however, Blue Shield launched an investigation in which it obtained extensive medical records.

Blue Shield argues that section 1389.3's prohibition on postclaims *underwriting* does not affect its right to perform a postclaims *investigation.* As one court observed, however, "the concept of 'post-claim underwriting' itself is nebulous, particularly because it is difficult to draw a distinction between post-claim eligibility investigation and post-claim underwriting." (*Northwestern Mut. Life Ins. Co. v. Babayan* (3d Cir. 2005) 430 F.3d 121, 138.) This difficulty arises because postclaims investigation and postclaims underwriting involve a common activity: research into a subscriber's precontract health after a claim is made to determine whether to rescind the plan due to misrepresentations or omissions in the original application. The distinction between postclaims investigation and postclaims underwriting thus lies primarily in the quality of the underwriting process undertaken before the policy is issued.

### 2. *The Plan's Duty Under Section 1389.3 to Make Reasonable Efforts to Ensure the Subscriber's Application Is Accurate and Complete as Part of the Precontract Underwriting Process*

Blue Shield argues section 1389.3 imposes no obligation to investigate the accuracy of a potential subscriber's application, unless questions arise from the answers given. We agree nothing on the Haileys' application raised any questions relating to Steve's health. But can a plan "complete medical underwriting" within the meaning of section 1389.3 by blindly accepting the responses on a subscriber's application without performing any inquiry into whether the responses were the result of mistake or inadvertence?

As noted by one commentator, "Most people are capable of forgetting facts at the time they apply for insurance, especially if those facts relate to a condition or event in the past which is no longer (and perhaps never was) deemed a problem by the applicant. [M]ost insureds probably don't expect to lose their coverage for an unintentional misrepresentation." (Ingram, *Misrepresentations in Applications for Insurance* (2005) 14 U. Miami Bus. L.Rev. 103, 106.) Given the likelihood of inadvertent error, accurate risk

assessment requires a reasonable check on the information the insurer uses to evaluate the risk.

■ Blue Shield contends health care service plans may complete the "medical underwriting" required under section 1389.3 by simply taking the submitted application and assigning values to the risks disclosed. We are not persuaded the Legislature intended such a narrow construction. In interpreting "medical underwriting," our duty is to ascertain the Legislature's intent so as to effectuate the law's purpose. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1127 [26 Cal.Rptr.2d 231, 864 P.2d 502].) Accordingly, " '[t]he words [of a statute] must be read in context, considering the nature and purpose of the statutory enactment.' " (*Torres v. Automobile Club of So. California* (1997) 15 Cal.4th 771, 777 [63 Cal.Rptr.2d 859, 937 P.2d 290].) The unmistakable purpose of section 1389.3's prohibition on "postclaims underwriting" is to prevent the unexpected cancellation of health care coverage at a time coverage is needed most.[5]

Assuming the truth of the Haileys' evidence, the tragic situation in which they now find themselves could have been averted had a Blue Shield agent or underwriter simply asked Cindy if she had included information for her husband and son. Blue Shield also might have determined a problem existed had it contacted the Haileys' primary care physician or previous health insurer. Indeed, the Haileys executed a release authorizing Blue Shield to obtain their medical information from their doctors and previous health care plan as part of their application. Blue Shield apparently had no difficulty using this release to obtain Steve's medical records after he filed his initial claim.

The situation here is factually similar to that in *Brandt v. Time Insurance Co.* (1998) 302 Ill.App.3d 159 [235 Ill.Dec. 270, 704 N.E.2d 843] (*Brandt*). There, the Illinois Appellate Court upheld rescission of a health services agreement where the insurer's investigation—undertaken after the subscriber was diagnosed with terminal stomach cancer—revealed the insurance broker failed to disclose the subscriber's diabetes in the application. Although recognizing the general principle of postclaims underwriting, the court concluded Illinois law did not require the insurer to perform a preclaims investigation of the subscriber's health.

Commenting on *Brandt,* one law review article noted: "The 'no investigation rule' of the Illinois court thus permits insurers to defeat the very nature

---

[5] Regarding the Senate bill (Sen. Bill No. 590 (1993–1994 Reg. Sess.)), the chairman of the Senate Committee on Insurance, Claims and Corporations noted in his letter to the Governor: "It is often said in this country that health insurance is only for the healthy. SB 590 is designed to make sure that insurance is available when you need it most."

of the aleatory contract of insurance. . . . [¶] [B]ecause the insurer has dealt with the insured as if there is coverage, the insured has stopped seeking additional sources of insurance. '[A]n insurer must do its investigation before issuance of the policy to allow the proposed insured to seek other coverage with another company [in the event of rejection] since no company will insure an individual who has suffered serious illness or injury.' [Fn. omitted.] This rationale is particularly pertinent to the Illinois appellate court's opinion, because no health insurer would provide coverage for an individual with terminal stomach cancer. However, some insurers might provide coverage to a diabetic. Therefore, *if the reasonable expectations of the insured are to be protected from opportunistic manipulation of the insurance relationship, then the insurer must be held to a duty of investigation before issuance of a policy, or at the very least before a claim is filed.*" (Cady & Gates, *supra*, 102 W.Va. L.Rev. at p. 858, italics added.) Although factually similar to *Brandt,* the present situation dictates a different outcome because—unlike Illinois law when *Brandt* was decided—California enacted a statute specifically designed to combat postclaims underwriting by requiring the plan to "complete medical underwriting . . . before issuing the plan contract." (§ 1389.3.)

■ Blue Shield asserts that under the common law and the Civil Code, it is entitled to rescind upon a negligently made misrepresentation. Rescission, however, is an equitable remedy, with certain qualifications that limit its application. " 'It is the purpose of rescission "to restore both parties to their former position as far as possible" [citation] and "to bring about substantial justice by adjusting the equities between the parties" despite the fact that "the status quo cannot be exactly reproduced" . . . .' " (*Neptune Society Corp. v. Longanecker* (1987) 194 Cal.App.3d 1233, 1246 [240 Cal.Rptr. 117].) The cancellation of a health services contract presents unique challenges to returning the parties to the status quo, or achieving substantial justice. Here, the trial court granted Blue Shield rescission and a monetary award representing the money it expended for health care costs incurred before rescission. Rescission returned Blue Shield to the status quo, but rescission seeks to restore the status quo to *both parties. (Ibid.)* The Haileys assert they could have received coverage under the health plan offered by Cindy's new employer had they been denied coverage under the Blue Shield plan. Under that scenario, the medical costs of Steve's automobile accident would have been covered. The trial court's rescission order, however, failed to return the Haileys to the status quo—not only are the Haileys left with unpaid medical bills, but Steve is left with a new preexisting condition that may limit his

ability to receive necessary health care. It is impossible to return the Haileys to the "status quo" under any definition of the term.[6]

The underwriting process insurers and health care plans undertake can vary widely. Some may require a physical examination or blood test, others may contact the applicants' doctors or previous health care plan, while still others may simply rely on an applicant's general statements regarding health. As one law review article noted: "The decision regarding the extent of preissuance underwriting is primarily a marketing decision for the insurer. 'Insurers must decide whether to investigate their applicants at the beginning, in which case they will accept fewer applications but also insure better risks, or increase sales by simplifying their underwriting requirements at the time of purchase and risk adverse selection.' " (Cady & Gates, *supra*, 102 W.Va. L.Rev. at p. 823.) Although the Legislature did not define "medical underwriting," we do not believe it intended to equate the term with whatever steps a plan took to evaluate the applicant based on its own marketing decisions or other considerations. Thus, to effectuate section 1389.3's purpose, and in light of the equitable nature of rescission, we interpret "medical underwriting" to require a plan to make reasonable efforts to ensure a potential subscriber's application is accurate and complete. Because the circumstances of each case vary, we do not precisely spell out what steps constitute a reasonable investigation. This will usually present a question of fact.

### 3. *The Supreme Court's Remedy for Postclaims Underwriting in* Barrera

 Arguing it is entitled to assess its risk by relying unquestioningly on the subscriber's responses to the health plan application questions, Blue Shield cites a number of insurance cases. (See *Mitchell v. United National Ins. Co.* (2005) 127 Cal.App.4th 457, 476 [25 Cal.Rptr.3d 627], and cases cited therein.) But each insurance case dealing with rescission since 1935 was decided either implicitly or expressly under Insurance Code section 331, which provides: "Concealment, whether intentional or unintentional, entitles the injured party to rescind insurance." (Ins. Code, § 331.) As Blue Shield emphasized both to the trial court and on appeal, Blue Shield is not an insurance company, and the Insurance Code and administrative regulations promulgated thereunder are not directly applicable to health care service plans.[7] (See *Williams v. California Physicians' Service* (1999) 72 Cal.App.4th

---

[6] We make our observations regarding the difficulty a court faces in returning to the status quo a health care subscriber who has suffered a serious illness or injury are made to illustrate the backdrop of section 1389.3, and are not intended to declare a change in the law of rescission in California.

[7] We do note, however, that section 1342.5 requires the Director of the Department of Managed Health Care to "consult with the Insurance Commissioner prior to adopting any regulations applicable to health care service plans subject to [the Knox-Keene Act] and other

722, 729 [85 Cal.Rptr.2d 497]; Ins. Code, § 740, subd. (g).) Significantly, the Knox-Keene Act does not have a counterpart to Insurance Code section 331.

In any event, even if we applied Insurance Code section 331, it would not change the result here. Specifically, our interpretation of section 1389.3 is consistent with the California Supreme Court's handling of postclaims underwriting in the automobile insurance arena, where Insurance Code section 331 applies. In *Barrera v. State Farm Mut. Automobile Ins. Co.* (1969) 71 Cal.2d 659 [79 Cal.Rptr. 106, 456 P.2d 674] (*Barrera*), a third party injured in a collision sued the insurer to collect a judgment against the insured. At trial, the insurer successfully asserted rescission based on the insured's misrepresentation in the insurance application. The Supreme Court reversed and remanded for a new trial.

Although not using the term "postclaims underwriting,"[8] the court described precisely the harm that inures from the practice: "With respect to an insurance policy voidable under [section 331 of] the Insurance Code, if an automobile liability insurer can perpetually postpone the investigation of insurability and concurrently retain its right to rescind until the injured person secures a judgment against the insured and sues the carrier, then the insurer can accept compensation without running any risk whatsoever. Such a rule would permit an automobile liability insurer to continue to pocket premiums and take no steps at all to probe the verity of the application for the issued policy unless and until the financial interest of the insurer so dictated. Furthermore, under such a rule, the carrier would be permitted to deal with the insured as though he were insured, and thus to lead him to believe that he was in fact insured." (*Barrera, supra*, 71 Cal.2d at p. 670.)

The Supreme Court noted the insurer issued the policy without conducting an investigation beyond asking the insured questions about his driving record. Recognizing the public policy in favor of protecting innocent drivers from financially insecure drivers, the court determined that "an automobile liability insurer must undertake a reasonable investigation of the insured's insurability within a reasonable period of time from the acceptance of the application and the issuance of a policy." (*Barrera, supra*, 71 Cal.2d at p. 663.) The court

---

entities governed by the Insurance Code for the specific purpose of ensuring, to the extent practical, that there is consistency of regulations applicable to these plans and entities by the Insurance Commissioner and the Director of the Department of Managed Health Care."

[8] When *Barrera* was decided, the term "postclaims underwriting" had not yet been coined. Nonetheless, at least one court subsequently observed that *Barrera* "emphatically rejects the practice of 'post-claim underwriting' in the case of automobile liability insurance . . . ." (*Bank of Oklahoma, N.A. v. Verex Assurance, Inc.* (10th Cir., Dec. 27, 1991, No. 90-6253) 1991 U.S.App. Lexis 31132.)

noted the question whether an insurer performed a reasonable investigation into insurability ordinarily would present a factual issue. (*Id.* at p. 681.) The court's description of the factors the trial court should consider in determining whether the insurance company conducted a reasonable investigation included "the cost of obtaining the information from the Department of Motor Vehicles, the availability of this information from the department or elsewhere . . . , and the general administrative burden of making such an investigation. [Fn. omitted.] These factors must be weighed against the importance of the protection of innocent members of the public against the consequences of automobile owners driving with voidable liability policies." (*Id.* at p. 682.)

As in *Barrera,* public policy favors requiring a health care services plan to demonstrate reasonable care in ensuring the accuracy of a potential subscriber's application as part of the precontract underwriting process. The Knox-Keene Act's express purpose in transferring the *risk* of health care from patients to plans requires nothing less. The sudden loss of health insurance after the onset of an acute illness or serious injury presents not only a financial disaster to the former subscriber, but places an additional strain on health providers and government resources already overburdened by the vast number of those without health insurance.

We note differences exist between *Barrera* and the present situation. In *Barrera,* the duty of reasonable investigation arose solely from public policy and equitable considerations. Here, the duty also finds support in a statute specifically aimed at postclaims underwriting. In *Barrera,* the failure to perform a reasonable investigation deprived the insurer of the ability only to rescind *ab initio*; the insurer still retained the right to cancel the policy and seek indemnity from the insured. Here, where no willful misrepresentation is established, the statute explicitly precludes the insurer from "rescinding, canceling, or limiting . . . a plan contract" (§ 1389.3) based on postclaims underwriting. Finally, *Barrera* required the insurer to complete underwriting within a reasonable time after accepting the application and issuing the policy. Section 1389.3 expressly requires the insurer to complete its underwriting process "before issuing the plan contract."

An applicant for a health services plan has a responsibility to exercise care in completing an application. In light of the potentially catastrophic consequences of an applicant's error in filling out an application, however, we believe the Legislature has placed a concurrent duty on the plan to make reasonable efforts to ensure it has all the necessary information to accurately assess the risk before issuing the contract, if the plan wishes to preserve the right to later rescind where it cannot show willful misrepresentation.

■ Because Blue Shield failed to demonstrate it made reasonable efforts to ensure the Haileys' application was accurate and complete as part of its precontract underwriting process, and the Haileys raised a triable issue of fact whether they willfully misrepresented Steve's physical condition when they applied for coverage, we reverse the judgment.

C. *Whether Blue Shield Engaged in Bad Faith Presents a Triable Issue of Fact*

Blue Shield argues that even if a triable issue of fact exists regarding the Haileys' breach of contract cause of action, it is entitled to judgment on their bad faith claim as a matter of law. We disagree.

■ "Every contract imposes on each party an implied duty of good faith and fair dealing. [Citation.] Simply stated, the burden imposed is ' "that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." ' [Citation.]" (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 345 [108 Cal.Rptr.2d 776] (*Chateau Chamberay*).) Although health care plans are governed by a different set of statutes and regulations than insurers, both are equally bound by the duty of good faith and fair dealing. (*Sarchett v. Blue Shield of California* (1987) 43 Cal.3d 1, 3 [233 Cal.Rptr. 76, 729 P.2d 267].)

■ In the case of an insurance policy, an insurer's delay or denial in the payment of policy benefits may expose it to liability if "the insurer acted *unreasonably* or *without proper cause.*" (*Chateau Chamberay, supra,* 90 Cal.App.4th at p. 347.) Blue Shield argues, however, that it acted reasonably and with good cause because a genuine dispute existed whether the Haileys willfully misrepresented Steve's medical condition and history, thus entitling it to rescind the health care contract. As Blue Shield points out, "It is now settled law in California that an insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract." (*Ibid.*) We agree the facts presented in this case disclose a "genuine dispute" whether the Haileys willfully misrepresented information relating to Steve's health on the application, which would allow Blue Shield to rescind the contract.

Nonetheless, as the Supreme Court recently observed: "The genuine dispute rule does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim. A *genuine* dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds. [Citations.] [Fn. omitted.] Nor does the rule alter the

standards for deciding and reviewing motions for summary judgment. 'The genuine issue rule in the context of bad faith claims allows a [trial] court to grant summary judgment when it is undisputed or indisputable that the basis for the insurer's denial of benefits was reasonable—for example, where even under the plaintiff's version of the facts there is a genuine issue as to the insurer's liability under California law. [Citation.] . . . On the other hand, an insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably.' [Citation.]" (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 724 [68 Cal.Rptr.3d 746, 171 P.3d 1082].)

The facts presented here raise an inference Blue Shield may have acted in bad faith by delaying its decision to rescind the policy. Specifically, Blue Shield first became suspicious that the Haileys may have withheld information relating to Steve's medical condition in February 2001, but failed to notify the Haileys of a potential problem until it sent out its rescission letter almost four months later in June. Cindy asserts they could have obtained health care coverage through her employer before Steve's accident had Blue Shield promptly notified her of a potential problem with her application.

Moreover, Blue Shield's underwriting investigator testified the company referred approximately 1,000 claims a year to her for investigation of possible misrepresentations or omissions in the subscribers' applications. Yet, she testified she decides to rescind in less than 1 percent of the cases she investigates. These facts raise the specter that Blue Shield does not immediately rescind health care contracts upon learning of potential grounds for rescission, but waits until the claims submitted under that contract exceed the monthly premiums being collected. In other words, a health care services plan may not adopt a "wait and see" attitude after learning of facts justifying rescission by continuing to collect premiums while keeping open its rescission option if the subscriber later experiences a serious accident or illness that generates large medical expenses. Accordingly, under the facts presented, we conclude a triable issue of fact exists whether Blue Shield acted in bad faith.

D. *The Haileys Adequately Alleged a Cause of Action for Intentional Infliction of Emotional Distress*

 1. *The Complaint Adequately Alleged Blue Shield Engaged in Extreme and Outrageous Conduct*

Under certain circumstances, a health care plan's conduct in handling a claim may result in liability for intentional infliction of emotional distress. (See *Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 304–305 [250 Cal.Rptr. 116, 758 P.2d 58].) To state a cause of

action, the plaintiff must allege "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; (3) and actual and proximate causation of the emotional distress by the defendant's outrageous conduct." (*Cervantez v. J. C. Penney Co.* (1979) 24 Cal.3d 579, 593 [156 Cal.Rptr. 198, 595 P.2d 975].) Here, Blue Shield contends the Haileys failed to adequately allege it engaged in extreme and outrageous conduct. We disagree.

To state a cause of action, the conduct alleged must be " 'so extreme and outrageous "as to go beyond all possible bo[u]nds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." ' " (*Coleman v. Republic Indemnity Ins. Co.* (2005) 132 Cal.App.4th 403, 416 [33 Cal.Rptr.3d 744] (*Coleman*).) " 'Behavior may be considered outrageous if a defendant (1) abuses a relation or position which gives him power to damage the plaintiff's interest; (2) knows the plaintiff is susceptible to injuries through mental distress; or (3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress.' " (*Agarwal v. Johnson* (1979) 25 Cal.3d 932, 946 [160 Cal.Rptr. 141, 603 P.2d 58], disapproved on another ground in *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 575, fn. 4 [88 Cal.Rptr.2d 19, 981 P.2d 944]; *McDaniel v. Gile* (1991) 230 Cal.App.3d 363, 372 [281 Cal.Rptr. 242].) "Moreover, ' "[t]he extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests. . . . [¶] *The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity.* The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know." ' " (*McDaniel*, at p. 372, italics added.)

Based on these standards, courts have rejected liability where, for example, the insurer simply delayed or denied insurance benefits (*Coleman, supra*, 132 Cal.App.4th at p. 417), refused to accept a settlement demand within policy limits (*Isaacson v. California Ins. Guarantee Assn.* (1988) 44 Cal.3d 775, 788–789 [244 Cal.Rptr. 655, 750 P.2d 297]), failed to investigate a claim and accused the insured of " 'trying to put something over on' " the insurer (*Ricard v. Pacific Indemnity Co.* (1982) 132 Cal.App.3d 886, 889, 895 [183 Cal.Rptr. 502]), or violated its duties under Insurance Code section 790.03 by misleading the claimant as to the applicable statute of limitations and advising the claimant not to obtain the services of an attorney. (*Coleman, supra*, at pp. 416–417.)

Conversely, in *Fletcher v. Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376 [89 Cal.Rptr. 78] (*Fletcher*), the insurer engaged in outrageous behavior by seeking to limit, and later denying, disability benefits based on unfounded assertions the insured's injury was the result of sickness or a birth defect. The insurer not only stopped payments without any supportable basis, but also threatened the insured with a lawsuit to recover previous payments and, knowing the insured was in dire financial straits, attempted to coerce him into surrendering his policy in exchange for $1,200. The court recognized the evidence demonstrated outrageous conduct because the insurer "embarked upon a concerted course of conduct to induce plaintiff to surrender his insurance policy or enter into a disadvantageous 'settlement' of a nonexistent dispute by means of false and threatening letters and the employment of economic pressure based upon his disabled and, therefore impecunious, condition, (the very thing insured against) exacerbated by [the insurer's] malicious and bad faith refusal to pay plaintiff's legitimate claim." (*Id.* at p. 392.)

Similarly, in *Hernandez v. General Adjustment Bureau* (1988) 199 Cal.App.3d 999 [245 Cal.Rptr. 288] (*Hernandez*), a salesclerk submitted a claim for workers' compensation benefits, based upon the psychological harm caused by crimes committed at the convenience store in which she had worked. The employee gave the insurance adjuster "medical records and reports detailing her serious medical and psychiatric problems which included major depression, nightmares, anxiety and repeated suicide attempts." (*Id.* at p. 1002.) The claimant alleged the adjuster knew of her fragile emotional condition, and that she provided the sole economic support for her three children. Despite this knowledge, and the lack of any dispute as to the claimant's entitlement to benefits, the adjuster consistently delayed disability payments. Based on these allegations, the trial court concluded the claimant stated a cause of action for intentional infliction of emotional distress. (*Id.* at p. 1007.)

The present situation is similar to *Fletcher* and *Hernandez* because Blue Shield knew about Steve's car accident, severe physical injuries, disability, and liability for mounting medical bills. Given these circumstances, Blue Shield knew it would cause plaintiffs to suffer emotional distress if it rescinded Steve's health care coverage. But the defendants in *Fletcher* and *Hernandez* had no reasonable basis for denying benefits. Here, in contrast, Blue Shield rescinded based on a "genuine dispute" over whether Cindy deliberately omitted Steve's medical history from the health care application.

"Undoubtedly an insurance company is privileged, in pursuing its own economic interests, to assert in a permissible way its legal rights and to communicate its position in good faith to its insured even though it is

substantially certain that in so doing emotional distress will be caused. [Citation.] . . . [¶] Nevertheless, the exercise of the privilege to assert one's legal rights must be done in a permissible way and with a good faith belief in the existence of the rights asserted. [Citation.] It is well established that one who, in exercising the privilege of asserting his own economic interests, acts in an outrageous manner may be held liable for intentional infliction of emotional distress." (*Fletcher, supra*, 10 Cal.App.3d at p. 396.)

Thus, a plan does not subject itself to liability for intentional infliction of emotional distress by attempting in good faith to assert its perceived legal right to rescind a health care services contract, even if it is likely the subscriber will suffer emotional distress. But a plan acts in an outrageous manner if it obtains information entitling it to rescind, yet deliberately forgoes rescission until after the subscriber has suffered a serious illness or injury. By adopting a "wait and see" attitude, a plan not only risks bad faith liability, but liability for intentional infliction of emotional distress if the plan knows the subscriber "is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity." As noted above, the facts alleged raise the specter that Blue Shield's final decision to rescind the Haileys' plan may not have come about because of omissions in the application, but because of the substantial medical bills resulting from Steve's automobile accident. Accordingly, we conclude the complaint sufficiently alleged extreme and outrageous conduct necessary to plead a cause of action for intentional infliction of emotional distress.

### 2. The Complaint Sufficiently Alleges the Haileys' Suffered Severe Emotional Distress

Blue Shield also contends that the complaint does not adequately allege the Haileys suffered severe emotional distress. We disagree.

Generally, a plaintiff may not recover for intentional infliction of emotional distress unless the distress suffered has been severe. (*Fletcher, supra*, 10 Cal.App.3d at p. 396.) A plaintiff, however, may recover for emotional distress alone without any resulting physical disability. (*Ibid.*) "Severe emotional distress means . . . emotional distress of such substantial quantity or enduring quality that no reasonable man in a civilized society should be expected to endure it." (*Id.* at p. 397.) It "may consist of any highly unpleasant mental reaction such as fright, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment or worry." (*Ibid.*)

In their complaint, the Haileys allege Blue Shield's rescission of their health coverage caused them severe emotional distress, causing depression, anxiety, and physical illness. As to Steve specifically, the complaint alleges

his emotional distress has resulted in vomiting, stomach cramps, and diarrhea. Although the complaint is not specific regarding the duration of these effects, the factual circumstances attendant in this case—Steve's inability to work, plaintiffs' inability to pay outstanding medical bills, and Steve's permanent loss of bladder function due to his inability to obtain needed medical care—demonstrate plaintiffs' emotional distress has been neither fleeting nor insignificant.

Arguing the complaint's allegations are insufficient, Blue Shield relies on a federal district court case, *Paulson v. State Farm Mut. Auto. Ins. Co.* (C.D.Cal. 1994) 867 F.Supp. 911 (*Paulson*), which declared: "California law requires that plaintiff prove that he suffered objective symptoms of distress. 'Headaches, insomnia, anxiety, irritability [are] not "severe" under California law.' " (*Id.* at p. 919.) This is an unsupported and incorrect statement of California law.

*Paulson* cited as lone authority for its erroneous declaration of California law another district court case, *Standard Wire & Cable Co. v. AmeriTrust Corp.* (C.D.Cal. 1988) 697 F.Supp. 368, 372 (*Standard Wire*). *Standard Wire*, however, made no mention of the "objective symptoms" standard, and our own review of California law reveals no authority requiring a plaintiff to demonstrate "objective symptoms" to recover for intentional infliction of emotional distress. Moreover, *Standard Wire* did not determine that headaches, insomnia, anxiety, and irritability could never be "severe" under California law, but ruled that "[t]*he plaintiffs' distress*—headaches, insomnia, anxiety, irritability—is not 'severe' under California law." (*Id.* at p. 372, italics added.) In other words, *Standard Wire* should be read as simply making a factual finding that the plaintiffs' symptoms *in that case* were insufficiently severe to support their emotional distress claim. Indeed, *Standard Wire* cites *Sanchez-Corea v. Bank of America* (1985) 38 Cal.3d 892, 909 [215 Cal.Rptr. 679, 701 P.2d 826], in which the California Supreme Court held that evidence of "alcoholism, *severe headaches, insomnia,* tension and *anxiety*" constituted substantial evidence supporting a verdict in favor of plaintiffs' claim for intentional infliction of emotional distress. (*Id.* at p. 909, italics added.) In sum, neither *Paulson* nor *Standard Wire* correctly states California law concerning the extent of emotional distress sufficient to support a claim for intentional infliction of emotional distress.[9] We conclude the complaint adequately alleges the Haileys suffered severe emotional distress.

---

[9] Similarly, cases citing *Standard Wire* should also not be relied upon for this purpose. (See, e.g., *Abuan v. General Electric Co.* (D. Guam, Feb. 25, 1992, Civ. A. No. 89-00031) 1992 U.S.Dist. Lexis 8334.)

## IV

### DISPOSITION

The judgment is reversed, and the writ petition is dismissed as moot. The Haileys are entitled to their costs on appeal.

Rylaarsdam, Acting P. J., and Ikola, J., concurred.

A petition for a rehearing was denied January 22, 2008, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied March 26, 2008, S160586.