**AJT Properties LLC v. Lexington Insurance Co.**

*Gene E. Goldenziel*, for plaintiff.

*Patrick R. Casey, Joseph G. McHale*, & *George E. Saba*, for defendant.

NEALON, *J.*, July 26, 2012—A commercial property owner which suffered flood damage in June 2006 has filed suit against its building and personal property insurer that has denied coverage based upon a policy exclusion for flood loss occurring on property located within a Special Flood

Hazard Area (SFHA). The insurer has filed a motion for summary judgment on the ground that there is no genuine issue of material fact that the subject property is situated in an SFHA such that the insurer is allegedly entitled to judgment as a matter of law by virtue of the unambiguous policy language excluding coverage for flood loss in such a zone.

The summary judgment record reflects that the property was inspected in May 2004 and determined not to be in an SFHA and that the property owner was issued a Federal Emergency Management Agency (FEMA) "Standard Flood Hazard Determination" to that effect. Two months after the insurer had issued the building and personal property policy to the owner in January 2006, it had the property surveyed in March 2006 to determine its insurability, and that inspection likewise concluded that the property was not in an SFHA district. The inspection report containing those flood exposure survey findings was forwarded to AJT. However, after the owner submitted his flood loss claim following the flood in late June 2006, the insurer retained a new inspector to examine the property's flood zone classification and that inspector issued a report concluding that the property is in an excluded SFHA. The authors of the May 2004 and March 2006 flood exposure surveys have revisited their original conclusions and now concur with the insurer's second inspector that the property is in an SFHA.

At the time that the owner purchased the insurance policy in early 2006, the insurer sold flood insurance for properties in SFHA zones, but the owner was not offered the opportunity to purchase such insurance since the parties

believed that the property was not in an SFHA, as per the flood exposure inspection conducted on behalf of the insurer in March 2006. There are genuine issues of material fact as to whether the owner would have purchased SFHA flood insurance if the insurer had performed a proper survey in March 2006 and had advised the owner that the property was located in an excluded SFHA. Depending upon how the jury resolves those factual issues, the insurer may be equitably estopped from denying coverage based upon its post-claim survey establishing that the property is in an excluded SFHA. Therefore, the insurer's motion for summary judgment based upon its SFHA exclusion will be denied, as will its alternate summary judgment arguments.

## I. FACTUAL BACKGROUND

Defendant Lexington Insurance Company ("Lexington") has filed a motion for summary judgment in this civil action which has been instituted by plaintiff AJT Properties, LLC ("AJT") against Lexington and AJT's insurance brokers, defendants Essick & Barr Insurance and VIST Insurance a/k/a VIST Financial, Inc. ("VIST"), seeking to recover damages for real and personal property losses caused by a flood on June 26, 2006. Lexington has denied AJT's flood damage claim on the primary grounds that the insurance policy excludes coverage for property located in a Special Flood Hazard Area (SFHA) and that AJT's property is indisputably situated in an SFHA zone. AJT has filed breach of contract claims against Lexington and VIST and alternative claims against Lexington for estoppel and unjust enrichment. See, *AJT Properties, LLC v. Lexington Insurance Company*, 2012 WL 1855809, at *

2 (Lacka. Co. 2012).

When the summary judgment record is viewed in the light most favorable to AJT as the non-moving party, it reveals that AJT owns real estate and a warehouse building at 40 Poplar Street, Scranton where Quaker Maid Cabinetry ("Quaker Maid") and custom design and manufacturing ("custom design") maintained their equipment, inventory and personal property in 2006. (Deposition of AJT's owner, Alexander J. Tarapchak, dated 10/26/11, p. 13; deposition of AJT's designated corporate representative, Paul Bocan, dated 10/26/11, pp. 12-14). AJT originally utilized Hampson Mowrer Kreitz Insurance as its insurance agent and broker, but upon learning after a 2004 flood that the insurance coverage which Hampson had procured for AJT did not provide flood loss coverage, AJT terminated its relationship with Hampson and retained VIST to act as its insurance agent and broker. (Tarapchak depo., pp. 275-279; Bocan depo., pp. 20-21; plaintiff's answers to Lexington's first set of requests for admission filed 2/23/10, ¶11). Subsequent to the 2004 flood but prior to its hiring of VIST, AJT also secured property insurance coverage from Selective Insurance Company ("Selective Insurance") which was issued through the national flood insurance program. (Tarapchak depo., pp. 281-283). AJT, Quaker Maid and custom design were identified as the named insureds on the selective policy which afforded $500,000.00 in building coverage and $500,000.00 in business personal property coverage for the period from November 12, 2005 through November 12, 2006.[1] (AJT's "Answer to statement of undisputed

---

1. Quaker Maid is an operating company that is engaged in the bus -

material facts of defendant Lexington Insurance Company in its memorandum in support of its motion for summary judgment," ¶4, attached to AJT's brief in opposition as exhibit B).

Once VIST was retained by AJT, it contacted a wholesale insurance broker, All-Risks, Ltd., to assist VIST in obtaining insurance coverage for AJT. (*Id.*, ¶5). All-Risks, Ltd. in turn contacted Eastern Risks Specialists, Inc. ("Eastern Risks") which acts as an underwriter for Lexington and is authorized to accept risks and bind accounts on behalf of Lexington within eastern risk's level of underwriting authority. (Deposition of Eastern Risks' designated corporate representative, John E. Groeneveld, CPCU, dated 4/3/12, pp. 13, 17-18, 34-35, 49, 128-129, 131, 161, 176, 181). Lexington is a surplus lines insurer that accepts insurance risks which other insurers will not insure, and Eastern Risks and Lexington are both owned by AIG Insurance. (*Id.*, pp. 11,108, 125). At the time that it was contacted by All-Risks, Ltd., Eastern Risks possessed the authority to bind Lexington to insure a property located in an SFHA zone, provided that the policy which was issued included a deductible representing 5% of the total insurable values of at least $1,000,000.00. (*Id.*, p. 177).Eastern Risks reviewed AJT's application for insurance from the producer, All-Risks, Ltd., and since

---

ness of manufacturing kitchen cabinetry, and custom design is the holding company that owns the equipment which is utilized by Quaker Maid to manufacture cabinets. (Tarapchak depo., pp. 11-12,266-267). AJT owns the Poplar Street warehouse where custom design's equipment is located, and Quaker Maid manufactures its kitchen cabinetry and maintains its inventory at that site. (*Id.*, pp. 12-13). Alexander J. Tarapchak is the President and sole owner of AJT, Quaker Maid and custom design. (*Id.*, pp. 10, 14, 265-267, 271).

the insurance requested was within Eastern Risks' level of underwriting authority with Lexington, it provided a $32,000.00 premium quote on behalf of Lexington and that offer was accepted and the premium was paid by AJT, such that an insurance policy was issued by Lexington on January 5,2006. (*Id.*, pp. 48, 61-62,131). The Lexington policy listed AJT as the sole named insured and provided coverage for the period from January 1, 2006 through January 1,2007. (AJT's "Answer to statement of undisputed facts," ¶11). The declarations page for the Lexington policy identifies the covered perils as "all risks of direct physical loss including flood (excluding SFHA)...." (*Id.*, ¶14). Endorsement #001 which accompanied the policy similarly states that any coverage for "[f]lood is excluded at locations wholly or partially within special flood hazard areas (SFHA), areas of 100-year flooding, as defined by the Federal emergency management agency."[2] (*Id.*).

The Lexington policy also included endorsement #004 entitled "flood endorsement" which includes some coverages that would otherwise be excluded by the policy's general provisions. (Groeneveld depo., pp. 95-97, 112-113, 116, 119-120). Endorsement #004 affords coverage for "[w]ater under the ground surface pressing on, or flowing

---

2. The Federal Emergency Management Agency (FEMA) creates maps of special flood hazard areas (SFHA), "which are defined as areas of land that would be inundated by a flood having a one percent chance of occurring in any given year." *Zimmerhanzel v. Green*, 346 S.W.3d 721, 723 (Tex. App. 2011). An SFHA is commonly known as a "100 year flood plain" since it represents an area where flooding is anticipated to occur every 100 years. *AJT*, supra, at * 2. (See also, Groeneveld depo., pp. 81-82, exhibit 16). Prior to securing insurance coverage with Lexington, AJT had received a FEMA "Standard Flood Hazard Determination" from LSI flood services dated May 27, 2004 which concluded that AJT's property was not located in an SFHA. (Bocan depo., pp. 56-57, 98, 103, defendants' exhibit no. 21).

or seeping through" foundations, floors, walls, basements, doors, windows and other openings. (LXU 00178). This additional policy endorsement establishes liability limits of $1,000,000.00 for any "loss or damage caused by or resulting from flood, meaning rising water,...rising (including the overflowing or breaking of boundaries) of...rivers,..., streams and other similar bodies of water..." (*Id.*).

Although Eastern Risks will "inspect properties to determine their insurability" with Lexington, (Groeneveld depo., pp. 66-67), neither Eastern Risks nor Lexington ever conducted an underwriting inspection prior to binding coverage with Lexington. (*Id.*, pp. 14, 34). After the policy was issued to AJT, Eastern Risks retained ISO Properties, Inc. ("ISO") to inspect AJT's property "[t]o determine if it was acceptable for coverage under Lexington" and "to make sure that the property was...insurable for Lexington Insurance Company." (*Id.*, pp. 35, 49). ISO conducted its survey of the property on March 3, 2006 and forwarded its report to Eastern Risks. (*Id.*, pp. 82-83). In its report, ISO indicated that AJT's "building was flooded in the fall of 2004 when the Lackawanna River, 80' from the building, overran its banks." (*Id.*, p. 83, exhibit 15, LXU 00070). Eastern Risks was also informed that "[t]he building had 4" of water in the first floor" as a result of that 2004 flood involving the Lackawanna River. (*Id.*). ISO's report further notes that after the 2004 flood, a flood protection levee was constructed. (*Id.*).

Based upon the inspection that was performed at Eastern Risk's request, ISO concluded that AJT's property

is located in a "CX" zone, not an SFHA.[3] (*Id.*). Eastern Risks' corporate designee has acknowledged that it would be "unusual" for a property to be located in a CX zone if it is situated within 100 feet of a river and has been involved in a flood within the past two years. (*Id.*, p. 139). Despite the fact that Eastern Risks was authorized by Lexington "to underwrite insurance for properties within a special flood hazard area," AJT was not afforded the option of purchasing flood insurance for property located in an SFHA zone. (*Id.*, pp. 176-177).

On June 26, 2006, a flood occurred at AJT's Poplar Street property and AJT submitted building and personal property loss claims to Selective Insurance and Lexington. (Lexington's statement of undisputed facts, ¶15; AJT's answer to statement of undisputed material facts, ¶15). Selective Insurance paid AJT its building coverage limits of $500,000.00 and its business personal property limits of $500,000.00. (*Id.*, ¶17). As part of its claim investigation, Lexington retained Urban Engineers, Inc. to examine whether AJT's property was located in an SFHA at the time of the flood, and Urban Engineers, Inc. subsequently issued a report which concluded that FEMA map no. 4205380010B (dated 8/15/80) indicates that AJT's property is positioned in an SFHA. (*Id.*, ¶¶18-19). Lexington thereafter denied coverage for the flood loss of June 26, 2006 based upon its policy exclusion for flood damage occurring wholly or partially within an SFHA.

___

3. A zone is classified as "CX" if it represents "[a]n area that is d - termined to be outside the 100 and 500 year flood plains." (Groeneveld Depo., p. 80, exhibit 16 at p. 2). By determining that AJT's property is located within a CX zone, ISO concluded that the probability of a flood occurring was less than once in every five hundred years (500 year flood plain). *AJT Properties*, supra, at * 2.

(Docket entry no. 175, ¶7).

AJT instituted this litigation on July 21, 2008 and later filed a complaint against Lexington, VIST and other parties on August 29, 2008. (Docket entry nos. 2,7). AJT's initial complaint set forth breach of contract claims against Lexington and VIST and a statutory bad faith claim against Lexington pursuant to 42 Pa.C.S. §8371. (Docket Entry No. 7, ¶¶17-36). Senior Judge Harold A. Thomson, Jr. later dismissed AJT's bad faith claim, and AJT filed an amended complaint on March 12, 2009 outlining more specific causes of action for breach of contract against Lexington and VIST. (Docket entry nos. 70,71). After Judge Thomson granted AJT's petition to file a "Revised second amended complaint," AJT filed another complaint which not only included its original breach of contract claims against Lexington and VIST, but also averred claims against Lexington for estoppel and unjust enrichment. (Docket entry nos. 99-100).

Lexington has now filed a motion seeking the entry of summary judgment, or in the alternative, the grant of partial summary judgment. Lexington first requests summary judgment in its entirety on the grounds that AJT's property is "indisputably" located in an SFHA and that Lexington's policy clearly excludes coverage for property in such a zone.[4] (Docket entry no. 210, pp. 2,12-14). Lexington alternatively seeks to reform the policy based upon mutual mistake so as to exclude coverage

---

4. Following the post-claim report by Lexington's inspector, Urban Engineers, Inc., based upon the August 15, 1980 FEMA map, LSI flood services and ISO amended their earlier reports and concluded that AJT's property is in an SFHA. (Docket entry no. 210, exhibits P-Q).

for personal property which it contends that neither party believed was insured. (*Id.*, pp. 19-21). In the event that Lexington's first two arguments are rejected and enforceable coverage is recognized, Lexington posits that AJT's claim is contractually capped at $2,500.00 since its policy language limits coverage to $2,500.00 for personal property of others, and the personal property that was destroyed in the flood was owned by Quaker Maid and custom design. (*Id.*, pp. 21-23).

AJT raises a series of arguments in opposing Lexington's motion for total or partial summary judgment. First, AJT maintains that flood loss coverage exists since Lexington improperly engaged in "post-claim underwriting" by waiting until after AJT presented its claim to conduct its underwriting analysis in order to deny coverage on the ground that the property is in an SFHA. (Docket entry no. 189, ¶7; Docket entry no. 226, pp. 18,21-23 and exhibit A, p.7). Second, AJT asserts that the language of endorsement #001 and endorsement #004 creates an ambiguity as to whether flood loss coverage is available to AJT, which ambiguity must be construed in AJT's favor and resolved by finding coverage. (Docket entry no. 226, pp. 10-11, 20-21,24-27). Third, because Lexington's representative conducted an inspection in March 2006 and concluded that AJT's property was located in a CX zone, AJT submits that Lexington is estopped from denying coverage based upon a post-claim finding that the property is in an SFHA. (Docket entry no. 189, ¶5; Docket entry no. 226, pp. 14-15). Last, AJT asserts that there are triable issues of fact regarding the $2,500.00 property coverage limit allegedly applicable to property owned by Quaker Maid and custom

design inasmuch as AJT, Quaker Maid and custom design are affiliated entities. (See, deposition of Paul Bocan on 10/26/11, p. 12,14, Docket entry no. 224). Those arguments will be addressed ad seriatim.

## II. DISCUSSION

### (A) STANDARD OF REVIEW

Summary judgment is appropriate "[o]nly where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law." *Dailey v. A. W. Chesterton, Inc.*, 37 A.3d 1175, 1179 (Pa. 2012). "On this critical question, the party who brought the motion has the burden of proving that no genuine issue of fact exists." *Stimmler v. Chestnut Hill Hospital*, 602 Pa. 539, 554, 981 A.2d 145, 154 (2009). In making that determination, "we view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party." *Barnett v. SKF USA, Inc.*, 38 A.3d 770, 776 n. 6 (Pa. 2012).

"Generally, the proper construction of a policy of insurance is a matter of law which may properly be resolved by a court pursuant to a motion for summary judgment." *Safe Auto Insurance Company v. Berlin*, 991 A.2d 327, 331 (Pa. Super. 2010); *Nationwide Mut. Inc. Co. v. Esgro*, 2011 WL 2294247, at * 5 (Lacka. Co. 2011). When deciding an insurance coverage issue by way of a motion for summary judgment, "we must review the record in the light most favorable to the non-moving party, granting it the benefit of all reasonable inferences and resolving all doubts in its favor." *Bishops, Inc. v. Penn National Insurance*, 984 A.2d

982, 989 (Pa. Super. 2009); *Erie Insurance Exchange v. Soroka*, 2011 WL 2516797, at * 4 (Lacka. Co. 2011), aff'd, no. 1086 MDA 2011 (Pa. Super. Mar. 8, 2012). As with all motions for summary judgment, a party may obtain a judgment with respect to an insurance coverage issue only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. *Ross v. Foremost Insurance Company*, 998 A.2d 648, 651 (Pa. Super. 2010).

### (B) POST-CLAIM UNDERWRITING

AJT advocates the recognition of a proscription against "post-claim underwriting" in Pennsylvania, and submits that Lexington is foreclosed from denying coverage based upon an underwriting determination that it first conducted after AJT presented its flood loss claim. AJT cites *Northwestern Mutual Life Insurance Company v. Babayan*, 2004 WL 1902516 (E.D.Pa. 2004) as the sole authority for adopting a post-claim underwriting ban in Pennsylvania. (Docket entry no. 226, pp. 21-23). Lexington has not specifically addressed the concept of post-claim underwriting in its original and supplemental briefs that it has filed in support of its motion for summary judgment. (Docket entry nos. 210, 229).

Underwriting is "the process, fundamental to the concept of insurance, of deciding which risks to insure and which to reject in order to spread losses over risks in an economically feasible way." *Hailey v. California Physicians' Service*, 158 Cal. App. 4th 452, 465, 69 Cal. Rptr. 3d 789, 799 (2008). The risk assessment task of underwriting is typically conducted prior to the issuance

of an insurance policy "to allow the insurer to ascertain the probability of its incurring liability for any loss that the insured might sustain and, therefore, whether it wishes to assume the risk of that loss." Cady & Gates, "post-claim underwriting," 102 W.Va.L.Rev. 809, 812 (2000). Post-claim underwriting occurs when an insurer "wait[s] until a claim has been filed to obtain information and make underwriting decisions which should have been made when the application [for insurance] was made, not after the policy was issued." *Lewis v. Equity Nat. Life Ins. Co.*, 637 So.2d 183,186 (Miss. 1994). Commentators who have condemned the practice of post-claim underwriting have argued that it enables the insurer to commence "[a]n investigation and assessment of the risk presented by the insured...only after the insurer is confronted with the prospect of contract performance" and to "marshal its resources to discover any historical minutiae related to the insured that might serve as an arguable basis" for "a post-hoc rationale for rescission" of the policy. Cady & Gates, supra, at 810. Jurisdictions which have found post-claim underwriting to be violative of an insurer's duty of good faith have reasoned:

It is patently unfair for a claimant to obtain a policy, pay his premiums and operate under the assumption that he is insured against a specified risk, only to learn *after* he submits a claim that he is *not* insured, and, therefore, cannot obtain any other policy to cover the loss. The insurer controls when the underwriting occurs.... If the insured is not an acceptable risk, the application should be denied up front, not after a policy is issued. This allows the proposed insured to seek other coverage

with another company since no company will insure an individual who has suffered serious illness or injury.

*Lewis*, 637 So.2d at 189 (emphasis in original); *Hailey*, supra (same).

In the *Babayan* decision cited by AJT, the insurer denied Babayan's claim for disability benefits on the ground that she failed to disclose certain medical conditions on her insurance application. Relying upon the Mississippi Supreme Court holding in *Lewis* and the West Virginia law review article quoted above, Babayan argued that her insurer's review of her application and corresponding denial of her claim constituted post-claim underwriting. *Babayan*, supra, at * 16-17. In declining to accept Babayan's proposition, the federal district court stated:

> While there might be local precedent that supports Babayan's contention that Pennsylvania courts can consult the scholarship of other jurisdictions in deciding these issues, the inescapable conclusion is that no Pennsylvania law forbade [the insurer] from conducting post-claim underwriting. As a federal court exercising its diversity jurisdiction and interpreting state law, the court believes that it would be imprudent to graft Mississippi law onto the circumstances in order to empower Babayan to assail post-claim underwriting where it is unclear whether Pennsylvania courts even would permit her arguments.

*Id.*, at* 17.

Babayan appealed the trial court ruling and asserted that the United States Court of appeals for the third

circuit "should predict that the Pennsylvania Supreme Court would conclude that 'post-claim underwriting' may constitute bad faith." *Northwestern Mutual Life Insurance Company v. Babayan*, 430 F.3d 121,137-138 (3d Cir. 2005). The appellate court noted that the insurer in *Lewis* "admittedly failed to perform any underwriting on the policy until after the insured filed her claim," and that "[a] subsequent decision interpreting *Lewis*...made a distinction between post-claim underwriting and post-claim investigation of eligibility." *Id.*, at 138 n. 23. The third circuit observed "that the concept of 'post-claim underwriting' itself is nebulous, particularly because it is difficult to draw a distinction between post-claim eligibility investigation and post-claim underwriting." *Id.*, at 138. Finding that "it is not bad faith to conduct a thorough investigation into a questionable claim," the court similarly rejected Babayan's argument and concluded that "Babayan's concept of 'post-claim underwriting' would usurp this general principle and prevent insurers from engaging in post-claim investigations, even in the face of incontrovertible evidence that an insured made a clear misrepresentation." *Id.*

No state or federal court in Pennsylvania has recognized, or even analyzed, the validity of a "post-claim underwriting" theory in the context of a property damage claim.[5] But even assuming arguendo that such a

---

5. In the only other reported Pennsylvania case mentioning post-claim underwriting, a federal district court made a passing reference to a former insurance regulation governing post-claim underwriting in connection with long term care insurance policies in Pennsylvania. Former section 89.908(d), 31 Pa. Code, provided that "[a]n insurer or other entity engaged in the sale of long-term care insurance may not issue a policy or certificate until the insurer or other entity applies its underwrit-

doctrine is cognizable in this Commonwealth, it is clearly inapplicable in this case. Those jurisdictions which recognize post-claim underwriting as a prohibited practice apply it only to situations where "an insurer simply fails to perform any actual underwriting until after a claim has been made." *Harper v. Fidelity & Guaranty Life Insurance Company*, 234 P.3d 1211,1221 (Wyo. 2010) (citing *Lewis*, supra.) Instantly, Lexington did not fail to conduct *any* underwriting prior to the flood on June 26, 2006. On the contrary, Lexington had an underwriting inspection of the property completed in early March 2006, almost three months prior to the flood and AJT's resultant claim.

The underwriting analysis in March 2006 erroneously concluded that AJT's property was located in a CX zone, whereas Lexington's subsequent investigation of AJT's flood loss claim determined that the property was situated in an SFHA. Since an underwriting examination of the property was actually conducted more than two months prior to the flood, Lexington's post-claim investigation of the proper flood zone classification did not constitute improper post-claim underwriting. See, *Babayan*, 430 F.3d at 138-139. Thus, it is unnecessary to predict whether the Pennsylvania Supreme Court would prohibit post-claim

---

ing standards and has determined the policyholder to be an acceptable risk." *Schneider v. Unum Life Insurance Company*, 149 F.Supp.2d 169, 187-188 (E.D.Pa. 2001). That provision has since been repealed and presumably replaced by 31 Pa. Code §89a. 110 entitled "Prohibition against post claims underwriting." Section 89a. 110 requires "[a]pplications for long-term care insurance policies" to "contain clear and unambiguous questions designed to ascertain the health condition of the applicant," and "[i]f the medications listed in the application were known by the insurer, or should have been known at the time of application, to be directly related to a medical condition for which coverage would otherwise be denied, the policy or certificate may not be rescinded for that condition." 31 Pa. Code §89a.110(a)-(b).

underwriting and regard that practice as bad faith conduct by a property insurer since the uncontroverted facts of this case do not support a claim of post-claim underwriting.

## (C) INSURANCE POLICY CONSTRUCTION

AJT next contends that Lexington's policy is ambiguous with regard to the existence of flood insurance coverage, as a result of which Lexington's motion for summary judgment should be denied. "The interpretation of an insurance contract regarding the existence or non-existence of coverage is generally performed by the court." *Donegal Mutual Insurance Company v. Baumhammers*, 595 Pa. 147, 154-155, 938 A.2d 286, 290 (2007); *Penn-America Ins. Co. v. Peccadillos, Inc.*, 27 A.3d 259, 264 (Pa. Super. 2011), app. denied, 34 A.3d 832 (Pa. 2011); *AJT Properties, LLC v. Pennsylvania Lumbermens Mut. Ins. Co.*, 2009 WL 1904103, at *4 (Lacka. Co. 2009). Insurance policies are contracts, and as such, are governed by the rules of contract interpretation. *Miller v. Poole*, 2012 WL 1980647, at * 2 (Pa. Super. 2002). The goal of insurance contract interpretation is "to ascertain the intent of the parties as manifested by the terms used in the written insurance policy." *Erie Insurance Exchange v. Conley*, 29 A.3d 389, 392 (Pa. Super. 2011); *Esgro*, supra, at *6.

Where the language of the insurance policy is clear and unambiguous, a court is required to give effect to that language. *Allstate Fire & Casualty Insurance Company v. Hymes*, 29 A.3d 1169,1172 (Pa. Super. 2011), app. denied, 2012 WL 1739017 (Pa. 2012); *Pennsylvania Lumbermens Mut. Ins. Co.*, supra, at * 3-4. However, if the policy provision is ambiguous, it must be construed in favor of

the insured and against the insurer as the drafter of the policy which controls coverage. *Conley*, supra; *Genaeya Corp. v. Harco National Insurance Company*, 991 A.2d 342,346 (Pa. Super. 2010). Policy language is ambiguous "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Miller*, supra, at * 3; *Petrochko v. Nationwide Mutual Insurance Company*, 15 D. & C. 5th 312, 319 (Lacka. Co. 2010), aff'd, 38 A.3d 917 (Pa. Super. 2011). Ambiguity "is not a question to be resolved in a vacuum," and insurance contract terms may be deemed "ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts." *Madison Construction Company v. Harleysville Mutual Insurance Company*, 557 Pa. 595, 606, 735 A.2d 100, 106 (1999); *Hymes*, supra.

An insurance provision is not rendered ambiguous merely because the parties do not agree upon its proper construction. *Donegal Mutual Insurance Company v. Raymond*, 899 A.2d 357, 361 (Pa. Super. 2006); *HARIE v. Lycoming County Housing Authority*, 58 D. & C. 4th 321, 343 (Lacka. Co. 2001), aff'd, 809 A.2d 1096 (Pa. Cmwlth. 2002). Nor should the court "distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity." *D'Adamo v. Erie Insurance Exchange*, 4 A.3d 1090, 1096 (Pa. Super. 2010), app. denied, 611 Pa. 656, 26 A.3d 483 (2011); *Petrochko*, supra at 319. Rather, "[w]hen analyzing an insurance policy, a court must construe words of common usage in their natural, plain and ordinary sense." *D'Adamo*, supra (quoting *Continental Casualty Company v. Pro Machine*, 916 A.2d 1111,1118 (Pa. Super. 2007)).

It is undisputed that paragraph "1.g.1)" of Section B of the policy entitled "Exclusions" states that Lexington "will not pay for loss or damage caused directly or indirectly by...[f]lood, surface water,...overflow of any body of water, or their spray, all whether driven by wind or not." (LXU 00156-157). As noted above, endorsement #001 further provides that any insurance coverage for "[f]lood is excluded at locations wholly or partially within Special Flood Hazard Areas (SFHA), areas of 100-year flooding, as defined by [FEMA]." (LXU 00175). Endorsement #004 affords coverage for water flowing or seeping through foundations, floors, walls or openings and provides liability limits of $1,000,000.00 for damage caused by "flood, meaning rising water,...rising (including the overflowing or breaking of boundaries) of...rivers,...streams and other similar bodies of water...." (LXU 00178).

Relying upon the report of its insurance underwriting expert, Mr. Akos Swierkiewicz, AJT posits that the foregoing policy provisions and endorsements create ambiguities relative to the existence of flood insurance coverage. Mr. Swierkiewicz states that "endorsement #004 includes coverage which would be excluded under 1.g.1)" of section B "exclusions" set forth in the policy.[6] (Docket

---

6. In the "opinions" portion of his report in which Mr. Swierkiewicz expresses opinions "to a reasonable degree of professional certainty," he does not include the above referenced statements concerning his proffered interpretation of the insurance policy. Instead, Mr. Swierkiewicz simply sets forth his opinions that "[u]nderwriting by Eastern Risks, on behalf of Lexington, fell outside industry custom and practice" and that "[c]laim handling by Lexington fell outside industry custom and practice, resulting in an unreasonable decision to decline [the] claim for the loss or damage caused by the flood on or about June 26, 2006." (Docket entry no. 26, exhibit A, pp. 12-13). Although Mr. Swierkiewicz has opined that those entities were negligent in their underwriting and claim handling, AJT has not advanced a negligence claim against Lexington or Eastern

entry no. 26, exhibit A, p. 6). With respect to the express exclusion in the declarations page and endorsement #001 for flood loss occurring in an SFHA zone, Mr. Swierkiewicz proposes that a post-claim email from Lexington's claims adjuster to Eastern Risk's underwriter on July 12, 2006 demonstrates "[t]he ambiguity of policy no. 1177937." (*Id.*, p. 7). In that e-mail, Lexington's adjuster indicated, and Eastern Risk's representative confirmed, that "[i]f only 1 location is listed, and the location is in a 100 yr. flood zone..., it would seem that the flood coverage provided by endorsement [#004] would never be available to the insured [AJT]." (*Id.*).

Notwithstanding Mr. Sienkiewicz's proposed construction of Lexington's policy, it is well settled that "the interpretation of an insurance policy is a question of law for the court." *Executive Risk Indemnity. Inc. v. Signa Corp.*, 987 A.2d 1170,1172 (Pa. Super. 2009); *Continental Casualty Company*, 916 A.2d at 1118 (Pa. Super 2007). The absence or existence of an ambiguity in a contract is likewise an issue of law for the court to decide. *International Diamond Importers. Ltd. v. Singularity Clark, L.P.*, 40 A.3d 1261,1278 (Pa. Super. 2012). Parol evidence may be considered only if the court first declares the policy language to be ambiguous, such that it is necessary for the trier of fact to review such extraneous evidence in order to resolve what the parties had intended by the ambiguous provision. *Id.*; *Betz v. Erie Insurance Exchange*, 957 A.2d

---

Risk. Compare, *Pennsylvania Lumbermens Mut. Ins. Co.*, supra. at * 7 (AJT asserted contract and negligence claims against insurer and broker after flood damage claim was denied); *Argenta v. A. J. Lupas Insurance Agency*, 104 Lacka. Jur. 430,443-444 (2003) (negligence claims against insurer and agent for failure to timely procure adequate insurance coverage), aff'd, 881 A.2d 876 (Pa. Super. 2005).

1244,1253 (Pa. Super. 2008), app. denied, 606 Pa. 659, 995 A.2d 350 (2010).

The provisions of Lexington's policy and endorsements #001 and #004 are clear, unequivocal and reconcilable and effect may be given to the language of each provision. Paragraph "1.g.1)" of section B of the policy generally excludes coverage for damage caused directly or indirectly by flood or overflow of any body of water. Mr. Swierkiewicz is correct that the general provision in paragraph "1.g.1)" is superseded by endorsement #004 which specifically provides coverage of $1,000,000.00 for damage caused by flood, including rising water from the overflow of rivers, streams and other similar bodies of water. See, *Trombetta v. Raymond James Financial Services, Inc.*, 907 A.2d 550,560 (Pa. Super. 2006) ("... the specific controls the general when interpreting a contract."). However, as per the plain language of the declarations page and endorsement #001, such flood loss coverage is afforded only if the insured property is not wholly or partially located within an SFHA zone. *Lesko v. Frankford Hospital-Bucks County*, 609 Pa. 115, 123-124,15 A.3d 337, 342 (2011) ("In determining the intent of the contracting parties, all provisions in the agreement will be construed together and each will be given effect").

Consequently, the unambiguous language of the policy and endorsements furnishes flood loss coverage of $1,000,000.00 to an insured, provided that the property in question is not situated in an SFHA (100 year flood plain). At the time that the Lexington policy was purchased, and during the entire policy period prior to June 26, 2006, AJT and Lexington operated under the belief that AJT's

warehouse was located in a CX zone (500 year flood plain). Absent the application of factually supported estoppel principles, the written provisions of Lexington's policy and endorsements are not reasonably susceptible of being understood as furnishing flood loss coverage for property in an SFHA. See, *Trizechahn Gateway, LLC v. Titus*, 601 Pa. 637, 653, 976 A.2d 474, 483 (2009) (when determining whether contract language is ambiguous and reasonably susceptible of different constructions, "[t]he 'reasonably' qualifier is important: there is no ambiguity if one of the two proffered meanings is unreasonable."). Since no ambiguity exists, it would be inappropriate to consider parol evidence of a post-claim email communication between Lexington and Eastern Risks.[7] See, *Miller*, supra, at * 2 (parol evidence is admissible only where an ambiguity is present and extrinsic proof if necessary to clarify or resolve the ambiguity). Therefore, there is no merit to AJT's claim that the policy is ambiguous relative to flood insurance coverage in an SFHA zone. What remains to be addressed, however, is whether Lexington is estopped from denying coverage based upon its underwriting investigation in March 2006 which concluded that AJT's property is in a CX zone.

## (D) ESTOPPEL

Two months after the insurance policy was issued to AJT, Lexington commissioned a survey of AJT's property

---

7. Even if the email of July 12, 2006 were to be considered, it merely concludes that the flood coverage provided by Endorsement #004 was not available if the property was located within a 100 year flood plain due to the express exclusion for an SFHA zone contained in the declarations page and endorsement #001. Such a construction is in conformity with the clear language of the policy and endorsements.

for underwriting purposes.[8] During that "flood exposure" survey in March 2006, AJT advised the inspector, ISO, that the property had been flooded in September 2004 when the Lackawanna River overran its banks and that AJT's warehouse had four inches of water in the first floor at that time. AJT further informed ISO that "[w]hen a flood warning is issued, stock is stored on pallets or put in trailers and removed from the area." (LXU00074). ISO noted in its report that AJT's building "is located 80' from the banks of the Lackawanna River." (*Id.*).

Based upon its review and survey of the property, Lexington's inspector issued a report dated March 3, 2006 which concluded "[t]hat flood zone is CX," i.e., beyond the 500 year flood plain.[9] (LXU00070). ISO's survey findings and recommendations were forwarded to AJT. (Bocan depo., pp. 99-100; Tarapchak depo., pp. 287-289). ISO's conclusion that AJT's property was not located in an SFHA zone was consistent with an earlier FEMA "Standard Flood Hazard Determination" that was made by LSI Flood Services on May 27, 2004. (*Id.*, pp. 56-57, 98, 103, defendants' exhibit no. 21). Prior to the flood on June 26, 2006, no survey had found that 40 Poplar Street was in an SFHA. In fact, when the owner of AJT, custom

_____

8. Section D of the "common policy conditions" granted Lexington the right to "[m]ake inspections and surveys at any time" relative to the property's "insurability and the premiums to be charged." (LXU00148). The policy also authorized Lexington to "[g]ive [the insured] reports on the conditions we find" during the inspection and to "[r]ecommend changes." (*Id.*).

9. As per the policy language referenced in n. 8, supra, ISO made recommendations concerning the storage and handling of flammable liquids and solvents in the warehouse and the installation of sprinklers in the paint spray booths. (LXU00068-00070). Although the inspector concluded that the insurable "risk is good," it further stated that it "would change to excellent if recommendations are corrected." (LXU00070).

design and Quaker Maid asked VIST about the SFHA exclusion noted on the Lexington policy, he was advised that it did not apply to AJT. (Tarapchak depo., pp. 62-64, 66, 100-101, 284-285, 289).

AJT submits that since it relied upon Lexington's underwriting conclusion that the property was not in an excluded SFHA, Lexington is estopped from denying coverage based upon post-claim inspections revealing that the property is located in a 100 year flood plain. Lexington asserts that AJT cannot succeed with its estoppel claim because it cannot establish that AJT reasonably relied upon some promise by Lexington in making a decision to take or forego certain action. (Docket entry no. 210, pp. 17-19). Citing 40 P.S. §1843, Lexington also argues that it cannot be liable for the actions of ISO and eastern risks in connection with the property survey in March 2006. (Docket entry no. 229, pp. 7-8).

To establish equitable estoppel, AJT must prove: (1) negligent misrepresentation of some material fact; (2) made with reason to know that the other party would rely upon it; and (3) inducement of the other party to act or fail to act to its detriment because of justifiable reliance on the negligent misrepresentation.[10] *Boyd v. Rockwood Area School District*, 907 A.2d 1157, 1168 (Pa. Cmwlth. 2006), app. denied, 591 Pa. 717, 919 A.2d 959 (2007). Under the

---

10. Pennsylvania has also adopted the related doctrine of promissory estoppel embodied in section 90 of the restatement (second) of contracts which states that "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promissee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Pennsy Supply, Inc. v. American Ash Recycling Corp.*, 895 A.2d 595, 606 (Pa. Super. 2006), app. denied, 589 Pa. 722, 907 A.2d 1103(2006).

equitable doctrine of estoppel, "[w]here...parties proceed in good faith reliance upon the other parties' contractual obligations, the doctrine will preclude the other parties from denying their obligations." *Sullivan v. County of Bucks*, 92 Pa. Cmwlth. 213, 230-231, 499 A.2d 678, 688 (1985), app. denied, 516 Pa. 623, 532 A.2d 21 (1986). The doctrine of estoppel may be invoked against an insurer with respect to an existing insurance contract, but it cannot create an insurance contract where none existed. *Donovan v. New York Cas. Co.*, 373 Pa. 145, 149, 94 A.2d 570, 572 (1953); *Allstate Insurance Company v. Warner*, 50 D. & C. 3d 383, 388 (Adams Co. 1988) ("Equitable estoppel, which is used to preclude a person from asserting or denying a claim, requires reasonable reliance on Allstate's misrepresentation that insurance coverage was in place for the Chevrolet."). As the Supreme Court of Pennsylvania observed more than seventy years ago, "[t]he cases in Pennsylvania and elsewhere that recognize the estoppel theory in insurance contract cases are all cases where some contractual relationship existed between the parties." *Antone v. New Amsterdam Casualty Co.*, 335 Pa. 134, 138, 6 A.2d 566, 568(1939).

The summary judgment materials submitted by the parties confirm that there are triable issues of fact as to whether Lexington is equitably estopped from denying flood insurance coverage based upon the SFHA exclusion. There is evidence in the summary judgment record that (a) Lexington's representative negligently misrepresented in March 2006 that AJT's property was not in an SFHA, and (b) that Lexington should have known that AJT

would reasonably rely upon that finding.[11] See, *Bortz v. Noone*, 556 Pa. 489, 501, 729 A.2d 555, 561 (1999) (with a negligent misrepresentation claim, as opposed to a fraudulent misrepresentation claim, the speaker need not know that the spoken words are untrue, but must have failed to make a reasonable investigation into the accuracy of the representation). The designated corporate representative for Lexington's own underwriter has admitted that it would be "unusual" for a property to be classified as situated in a CX zone (500 year flood plain) if it is located within 100 feet of a river and had suffered a flood two years earlier when that river overran its banks. (Groeneveld depo., p. 139). If Lexington had conducted a proper survey in March 2006 and had informed AJT that its property was in an excluded SFHA, AJT may have opted to purchase the SFHA insurance which Eastern Risks

---

11. Lexington has not established that it is immune from civil liability for ISO's survey and finding based upon the insurance consultation services exemption in 40 P.S. §1843. Section 1843(a) of the insurance consultation services act provides that "[t]he furnishing of, or failure to furnish, insurance consultation services related to, in connection with or incidental to a policy of insurance shall not subject the insurer...to liability for damages from...loss occurring as a result of any act or omission by any person in the course of such services." 40 P.S.§1843(a). Insurance consultation services are defined by the act as "consultation, inspection, advisory or related services performed by an insurer, its agents, employees or service contractors incident to an application for insurance." 40 P.S.§1841. However, §1843(c) expressly states that the immunity provisions do not apply "unless the insurer furnishes the insured with written notice of the provisions of this act," which notice must be provided "by the insurer at the time the policy is issued or written and at each subsequent renewal thereof." 40 P.S. §1843(c). There is absolutely no indication in the summary judgment record that Lexington ever provided the statutory notice required by §1843(c) for the immunity protection of the act to apply. As a result, Lexington is not entitled to immunity under 40 P.S. §1843 for the negligent misrepresentation(s) by ISO and Eastern Risks. See, *Pennsylvania Lumbermens Mut. Ins. Co.*, supra, at *7 (denying insurer's motion for summary judgment based upon 40 P.S. §1843(a) absent proof that insurer had furnished the insured with the required statutory notice).

was authorized to offer for a higher 5% deductible. (See, Groeneveld depo., p. 177). Only a jury should decide the factual issue of whether AJT would have acquired flood insurance for an SFHA property if Lexington's inspector had not negligently concluded and represented to AJT that the property was in a CX zone.

There are genuine issues of material fact with respect to AJT's detrimental and justifiable reliance upon the alleged negligent misrepresentation in March 2006 that the property was in a CX region. Compare, *Shannopin Mining Company v. State Workmen's Insurance Fund*, 124 Pa. Cmwlth. 364, 374,556 A.2d 488, 493 (1989) (holding that insurance fund was not estopped from denying coverage for worker's compensation claims and stating that "[t]here being no detrimental reliance, we decline to apply the equitable doctrine of estoppel."), app. denied, 525 Pa. 591, 575 A.2d 120 (1990). In insurance contract litigation, "[t]he doctrine of estoppel is based upon the principle that a person is held to a representation made or a position assumed, where otherwise inequitable consequences would result to another who, having the right to do so under all these circumstances of the case, has in good faith relied thereon." Antone, 335 Pa. at 140, 6 A.2d at 569. In light of the factual disputes relative to AJT's reasonable reliance upon the only pre-flood inspection that was conducted on behalf of Lexington, the doctrine of equitable estoppel precludes Lexington from securing summary judgment based upon the SFHA exclusion in the declarations page and endorsement #001. See e.g., *Florida Municipal Insurance Trust v. Village of Golf*, 850 So.2d 544, 548 (Fla. 4th DCA 2003) (insurer was estopped

from denying coverage based upon pollution exclusion in policy since insured was prejudiced by insurer's negligent investigation of crop damage claim before suit was filed); *Bituminous Casualty Corp. v. Balwin*, 196 Va. 1020, 1024, 86 S.E.2d 836, 838 (1955) (insurer, whose agent placed coverage for coal mine operators on April 28, was estopped from declining insurance coverage on May 23 for May 22 injury, based upon its inspector's report on May 12 that mine operation was hazardous and an uninsurable risk).

## (E) POLICY REFORMATION BASED UPON MUTUAL MISTAKE

Lexington alternatively argues that even if flood insurance coverage is found to exist, the policy should be reformed to exclude coverage for personal property based upon the parties' mutual mistake. Lexington contends that it is uncontroverted that AJT "never requested that the Lexington policy include insurance coverage for personal property" and that "Lexington never agreed to provide insurance coverage for personal property." (Docket entry no. 210, p. 20). AJT's brief in opposition does not address Lexington's mutual mistake argument.

Reformation of a contract is an equitable remedy that is sparingly granted and "presupposes that a valid contract between the parties was created but, for some reason, was not properly reflected in the instrument that memorializes the agreement." *Erie Telecommunications, Inc. v. City of Erie*, 853 F.2d 1084, 1091 (3d Cir. 1988); *AJT Properties*, supra, at *3. A mutual mistake will afford a basis for reforming a contract "only where both parties to a contract are mistaken as to existing facts at the time of

execution," and the party attempting to reform the contract "show[s] the existence of the mutual mistake by evidence that is clear, precise and convincing." *Zurich American Insurance Company v. O'Hanlon*, 968 A.2d 765, 770 (Pa. Super. 2009); *AJT Properties*, supra. Clear and convincing evidence "is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts and issue." *Kimock v. Jones*, 2012 WL 2308178, at * 5 (Pa. Super. 2012). ·

Alexander J. Tarapchak and custom design's controller, Paul Bocan, handled the insurance needs for AJT, custom designs and Quaker Maid and participated in the insurance discussions with VIST. (Tarapchak depo., p. 57). Tarapchak specifically requested insurance coverage for AJT's warehouse and its contents, including the personal property of custom designs and Quaker Maid. (*Id.*, pp. 57, 80-81, 104-105). Tarapchak also requested that AJT, Custom design and Quaker Maid be listed as insureds on the Lexington policy, (*Id.*, p. 106), and that the personal property to be covered "would be personal property of everybody; of AJT, CDM [Custom Designs], Quaker Maid." (*Id.*, p. 79). Bocan similarly testified that he required that the Lexington policy provide coverage for personal property. (Bocan depo., p. 46). More importantly, the plain language of Lexington's policy reflects that intent and expressly states that it covers both real and personal property. (*Id.*, pp. 93, 107-108, Plaintiff's exhibit no. 27).

Hence, Lexington has not identified clear, precise and convincing proof that Lexington and AJT both believed that the policy did not afford coverage for personal property.

The testimony of Mr. Tarapchak and Mr. Bocan confirms that AJT requested personal property coverage and that the language of the policy provided such coverage. As a consequence, Lexington has not demonstrated its clear right to reformation of the policy, so as to exclude personal property coverage based upon the parties' alleged mutual mistake.

(F) PROPERTY DAMAGE COVERAGE LIMITATION

Lexington also requests partial summary judgment and seeks to limit AJT's personal property claim to coverage of $2,500.00. Lexington relies upon the policy provision which extends coverage to "[p]ersonal property of others in your care, custody or control," but further provides that "[t]he most [Lexington] will pay for loss or damage under this extension is two thousand five hundred (2,500.00) dollars at each described premises." (LXU 00166-167). As the party seeking to restrict coverage based upon that provision, Lexington bears the burden of proving the applicability of that coverage limitation. *Ace American Insurance Company v. Underwriters at Lloyds and Companies*, 939 A.2d 935, 940 (Pa. Super. 2007), aff'd, 601 Pa. 95, 971 A.2d 1121 (2009).

The summary judgment materials that have been submitted by the parties do not reflect that Lexington's policy defines the word "you" when referencing the insured(s) under the policy, nor does the record otherwise indicate who is included or excluded by that term. Compare, *Berlin*, 991 A.2d at 333 (PA. Super 2010) (fire department did "not qualify as one of those covered

under the policy's definition of "you, your, yourself."); *Insurance Company of Evanston v. Bowers*, 758 A.2d 213, 221-222 (Pa. Super. 2000) (minor bicyclist in treatment corporation's custody as a delinquent juvenile was not an insured under corporate policy's definition of that term). As noted above, AJT, custom designs and Quaker Maid are all solely owned and operated by Alexander J. Tarapchak. Custom design's controller, Paul Bocan, performed the accounting for all three entities and represented them in selecting their insurance coverages. (Bocan depo., pp. 10, 12, 26, 29, 33, 95-96). From 2002 to 2006, Mr. Bocan's salary as controller was paid by custom designs, but from 2006 to 2010, he was paid by Quaker Maid. (*Id.*, p. 11). In his deposition testimony, Mr. Bocan referred to AJT, custom designs and Quaker Maid collectively as "the company." (*Id.*, pp. 19-20).

The summary judgment record does not clearly establish that the $2,500.00 limitation applicable to the personal property "of others" governs AJT's claims for damage to custom design's equipment and Quaker Maid's inventory. See, *Leggett v. National Union Fire Insurance Company of Pittsburgh*, 844 A.2d 575, 577 (Pa. Super. 2004)("Leggett was employed by High Safety Consulting Services, Ltd., an affiliated company of the policy holder, High Industries, Inc. We agree with the highly regarded trial judge...that the National Union policy covers Leggett in this accident in that he was acting within the scope of his duties."), aff'd, 583 Pa. 62, 874 A.2d 1159 (2005). Absent a policy definition stating that AJT is the lone insured under the Lexington policy, it is not clear that AJT's claim for damage to the contents of its warehouse

is subject to the $2,500.00 personal property coverage limitation. Accordingly, Lexington's motion for partial summary judgment will also be denied. An appropriate Order follows:

## ORDER

And now, July 26, 2012, upon consideration of the motion for summary judgment of defendant Lexington Insurance Company, the exhibits and memoranda of law submitted by the parties, and the oral argument of counsel on May 31, 2012, and based upon the reasoning set forth in the foregoing memorandum, it is hereby ordered and decreed that the motion for summary judgment of defendant Lexington Insurance Company is denied.