Filed 8/13/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| EMMA SANDOVAL, a Minor, etc., et al.,<br><br>　　Plaintiffs and Appellants,<br><br>　　　　v.<br><br>PALI INSTITUTE, INC.,<br><br>　　Defendant and Appellant. | G063037<br><br>(Super. Ct. No. 30-2022-01294532)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Nathan N. Vu, Judge. Affirmed, in part, reversed, in part, and remanded with directions. Request for judicial notice. Granted.

Horvitz & Levy, Lisa Perrochet, and Mark A. Kressel; Olson Law Group, Sonali Olson, and Sherri Matta for Defendant and Appellant.

1

Lex Rex Institute, Alexander H. Haberbush, and Deborah L. Pauly for Plaintiffs and Appellants.

After returning home from a multiday overnight science camp run by defendant Pali Institute, Inc. (Pali) and organized by their public school district, plaintiffs sued Pali and the school district for intentional infliction of emotional distress and negligent infliction of emotional distress based, in part, on their exposure to gender identity related discussions while at the camp. Pali sought to strike the complaint, and each of the causes of action therein, pursuant to Code of Civil Procedure section 425.16,[1] the anti-SLAPP statute. However, the trial court denied the motion, concluding plaintiffs' causes of action do not arise from anti-SLAPP protected activity.

Focusing on the complaint's allegations, as well as documents filed by the parties in conjunction with Pali's motion, we conclude the trial court erred in denying the motion in its entirety. Notwithstanding plaintiffs' assertions to the contrary, some of their claims undoubtedly arise from communications by, and actions of, Pali's camp counselors concerning gender identity related matters. With gender identity being a topic of widespread public interest, one that even the United States Supreme Court has deemed to be "of profound "'value and concern to the public'"" (*Janus v. American Federation of State, County, and Municipal Employees* (2018) 585 U.S. 878, 913–914 (*Janus*)), we conclude the activity on which some of plaintiffs' claims are based falls within the scope of the anti-SLAPP statute's protections. In addition, plaintiffs failed to meet their anti-SLAPP burden of demonstrating

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise stated.

those claims are legally sufficient and factually substantiated. They did not submit admissible evidence showing the minimal merit of the claims and, as a matter of law, intentional infliction of emotional distress and negligent infliction of emotional distress liability cannot arise from the type of alleged exposure to gender identity related matters.

Accordingly, Pali's motion should have been granted, in part, and the trial court erred in doing otherwise. In contrast, we find no error in the court's denial of plaintiffs' motion for attorney fees related to the anti-SLAPP motion, and we affirm that aspect of the order.

FACTS

While in fifth grade, at 10 and 11 years old, plaintiffs attended an overnight science camp arranged by their public school district and run by Pali. After returning from the four-day camp, plaintiffs sued the school district and Pali for intentional infliction of emotional distress (IIED) and negligent infliction of emotional distress (NIED).

The complaint alleges plaintiffs "were introduced to camp counselors of unknown and ambiguous gender who identified themselves with 'they/them' third person pronouns and asked the students in attendance their 'preferred pronouns.' They further asked students to state their 'preferred pronouns' and taught students various matters pertaining to transgendered identification and sexual identity." It further alleges plaintiffs had to sleep in a dormitory with only one camp counselor and that counselor identified with they/them pronouns. When they allegedly asked to call their parents to discuss these matters, camp counselors did not let them due to a Pali policy prohibiting students from calling home while at camp.

3

As part of their IIED cause of action, plaintiffs allege Pali's actions "were intentional, extreme, and . . . done with the intent to cause emotional distress or with reckless disregard of the probability of causing plaintiffs emotional distress." And as part of their NIED cause of action, they allege Pali owed them a duty of care "to ensure [they] were not exposed to foreseeable harms." Both causes of action allege Pali's conduct caused them severe emotional distress.

In response to the complaint, Pali filed an anti-SLAPP motion to strike both causes of action. It argued they arose from "Pali's counselors' alleged *communications* with [p]laintiffs about their nonbinary gender identification, the use of preferred pronouns, and other matters concerning gender and sexual identity," as well as Pali's decision not to allow plaintiffs to call their parents to discuss those communications. And, so its argument went, because issues concerning gender identity and expression, as well as LGBTQ+ rights are matters of public interest, the activity on which plaintiffs' claims were based qualified as protected activity under section 425.16, subdivision (e)(4).

Plaintiffs opposed the motion, arguing the anti-SLAPP statute did not apply and, even if it did, their causes of action had the requisite minimal merit. They also sought attorney fees under section 425.16, subdivision (d), contending Pali's motion was frivolous.

Regarding the anti-SLAPP statute's application, plaintiffs did not argue the counselors' statements failed to qualify as protected activity. Instead, they contended those allegations were merely incidental to their claims, and "the gravamen of [their] [c]omplaint [was] clearly based on Pali's

4

lack of disclosure and Pali's prevention of children from contacting their parents when concerns arose."

As for the merits, plaintiffs asserted their alleged facts demonstrated the requisite minimal merit of their claims. With their opposition, they submitted a single declaration—a one and a half page declaration from the mother (the mother) of one of the plaintiffs (the daughter). The declaration set forth a more detailed account of what the daughter said occurred at camp. According to the declaration, the counselors "aggressively introduced themselves with their preferred pronouns and threatened the children with disciplinary action if they failed to use the[] pronouns correctly." The daughter felt scared and asked to call home, but that request was denied repeatedly. In doing so, the counselor "belittled" the daughter's feelings as "'stupid.'" When peers tried to comfort her, the counselor "scolded" them and sent them back to bed, "further exacerbating [her] feelings of isolation and fear." The daughter was later denied some "privileges granted to the other campers," such as being able to drink soda. When the daughter returned home, the mother observed "the negative effects of the camp experience on [her]," such as developing a phobia of being alone and not wanting to sleep alone. For these reasons, the daughter started professional therapy with her grandfather.

Each side objected to evidence submitted by the other side. Plaintiffs objected to a declaration by Pali's counsel which attached an internet based news article about what allegedly occurred at the camp and its resulting community impact. Pali objected to the mother's declaration on various grounds, including lack of foundation, lack of personal knowledge,

5

and hearsay. Given those objections, Pali argued plaintiffs failed to provide any evidence to establish the minimal merit of their claims.

The trial court held a hearing on the anti-SLAPP motion and later issued an order denying it, concluding plaintiffs' claims fell outside the protections of the anti-SLAPP statute because they were not based on protected activity. More specifically, the court found Pali's right of petition or right of free speech, as well as its counselors' communications with plaintiffs about gender identity, were not the basis of the claims. Instead, the court believed the "claims ar[o]se from [Pali's] failure to inform [p]laintiffs and their parents . . . of the subjects to which [p]laintiffs would be exposed, [Pali's] . . . actions exposing [p]laintiffs to these subjects without the knowledge or consent of [p]laintiffs and their parents," and the decision to prohibit "[p]laintiffs from calling their parents . . . to discuss the subjects to which they were being exposed."

Because the court determined the anti-SLAPP statute did not apply, it did not reach the question of whether plaintiffs demonstrated the minimal merit of their claims. Nevertheless, it ruled on the parties' evidentiary objections, sustaining plaintiffs' sole objection and some of Pali's objections. The court overruled Pali's hearsay objection which asserted that information in the mother's declaration appeared to be based on statements made to her by the daughter. The court also denied plaintiffs' attorney fees request, finding Pali's "motion was neither objectively frivolous (i.e., totally devoid of merit), nor solely intended to cause unnecessary delay or taken in bad faith."

Pali timely appealed and plaintiffs timely cross-appealed.

6

DISCUSSION

Pali contends the trial court erred in concluding plaintiffs' claims do not arise from protected activity, as defined by the anti-SLAPP statute. From its perspective, all the claims arise from the camp counselors' discussions and actions concerning gender identity, a topic which it asserts is of broad public interest and debate, rendering them protected activity under section 425.16, subdivision (e)(4). In contrast, plaintiffs distance themselves from that topic, arguing their claims arise from certain action or inaction by Pali that is unconnected to the gender identity related matters. On the record before us, Pali has the better argument as to some of plaintiffs' claims. And, performing the requisite second step of the anti-SLAPP evaluation, we conclude plaintiffs have not met their burden of showing those claims are factually substantiated or legally sufficient, meaning the motion should have been granted as to those claims. At the same time, we find no error in the court's denial of plaintiffs' anti-SLAPP attorney fees request.

I.

ANTI-SLAPP LEGAL PRINCIPLES AND STANDARD OF REVIEW

"The Legislature enacted section 425.16 in response to 'a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.'" (*Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 619 (*Rand Resources*).) The special motion to strike provided for in the statute is "'intended to resolve quickly and relatively inexpensively meritless lawsuits that threaten free speech on matters of public interest.'" (*Ibid.*) By legislative direction, the statute is to "be construed broadly." (§ 425.16, subd. (a).)

7

"Litigation of an anti-SLAPP motion involves a two-step process. First, 'the moving defendant bears the burden of establishing that the challenged allegations or claims "aris[e] from" protected activity in which the defendant has engaged.'" (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1009 (*Bonni*).) The statute sets forth four categories of protected activity. (§ 425.16, subd. (e).) The focus at this step is identifying the alleged protected acts and determining whether they supply the basis for any claim. (*Bonni*, at p. 1010.) "It does not matter that other unprotected acts may also have been alleged within what has been labeled a single cause of action; these are 'disregarded at this stage.'" (*Ibid.*)

"Second, for each claim that does arise from protected activity, the plaintiff must show the claim has 'at least "minimal merit."'" (*Bonni, supra*, 11 Cal.5th at p. 1009.) This step of the anti-SLAPP analysis "has been described as a summary-judgment-like procedure. [Citation.] The court determines whether "'the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment.'" [Citation.] The plaintiff "'may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence.'" [Citation.] The defendant may submit evidence in support of its motion. [Citation.] However, "'[t]he court does not weigh evidence or resolve conflicting factual claims.'" [Citation.] Rather, the court "accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law. [Citation.] '[C]laims with the requisite minimal merit may proceed.'"'" (*Billauer v. Escobar-Eck* (2023) 88 Cal.App.5th 953, 962 (*Billauer*).) Conversely, "[i]f the

plaintiff cannot make this showing, the court will strike the claim." (*Bonni*, at p. 1009.)

"On appeal, we review [an anti-SLAPP] motion de novo and independently determine whether the parties have met their respective burdens." (*Cross v. Cooper* (2011) 197 Cal.App.4th 357, 371.) We employ the same two-step process used by the trial court. (*Billauer, supra*, 88 Cal.App.5th at p. 962.) "'Only a [claim] that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute.'" (*Ibid*.)

## II.

### STEP ONE: ARISING FROM PROTECTED ACTIVITY

Contending the trial court erred in concluding plaintiffs' claims fall outside the scope of the anti-SLAPP statute, Pali relies on a single category of protected activity which is often referred to as the "catchall." It encompasses "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).)

In *FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 149–152 (*FilmOn*), the Supreme Court outlined a two-part analysis for determining whether activity falls within the scope of the "catchall" provision. "First, we ask what 'public issue or [ ] issue of public interest' the speech in question implicates—a question we answer by looking to the content of the speech. [Citation.] Second, we ask what functional relationship exists between the speech and the public conversation about some matter of

9

public interest." (*Id.* at pp. 149–150.) A key consideration is the context in which the speech occurred, including the audience, the speaker and the communication's purpose. (*Id.* at pp. 151–152.) Overall, "'some degree of closeness' between the challenged statements and the asserted public interest [is required]. [Citation.] . . . '[I]t is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate." (*Id.* at p. 150.)

With the amount of public discourse in the recent years at all levels of society nationwide—from government to local communities and everything in between—concerning gender identity, the topic and matters related to it (e.g., use of personal pronouns) are undoubtedly issues of public interest.[2] (See *Janus, supra,* 585 U.S. at pp. 913–914 [listing gender identity as a "controversial," "sensitive political topic[]" that is "undoubtedly [a] matter[] of profound "'value and concern to the public""']; *In re M.T.* (2024) 106 Cal.App.5th 322, 337–341 [addressing for first time whether transgender person has privacy interest in concealing transgender identity]; *People v. Zarazua* (2022) 85 Cal.App.5th 639, 642 ["Parties are to be treated with respect, courtesy, and dignity—including the use of preferred pronouns.

_____

[2] We grant Pali's unopposed request for judicial notice of three government agency publications, two federal and one State of California, concerning gender identity related matters. (Evid. Code, §§ 453, 459.) And, consistent with its request, we only take judicial notice of the publications, not of the truth of their contents. (See *Julian Volunteer Fire Co. Assn. v. Julian-Cuyamaca Fire Protection Dist.* (2021) 62 Cal.App.5th 583, 600.) Separately, because we find ample support for deeming gender identity related matters to be issues of public interest, we do not address whether the trial court properly sustained plaintiffs' objection to a news article Pali submitted via declaration in the trial court which concerned the camp experience and the resulting controversy.

Failure to do so offends the administration of justice"]; *Meriwether v. Hartop* (6th Cir. 2021) 992 F.3d 492, 506, 508 [describing gender identity as "hotly contested matter of public concern" and use of gender pronouns as "implicating a sensitive topic of public concern"]; Clarke, *They, Them, and Theirs* (2019) 132 Harv. L.Rev. 894, 896 ["With stunning speed, nonbinary gender identities have gone from obscurity to prominence in American public life"].)

We likewise have no trouble concluding the discussion of gender identity by those responsible for students in a public school setting has a sufficiently functional relationship to the broader public debate to qualify as protected activity under the catchall provision.[3] (See *Film On, supra,* 7 Cal.5th at pp. 149–152; *Rand Resources, supra,* 6 Cal.5th at p. 621 [statement that "involves 'a topic of widespread, public interest'" falls within ambit of anti-SLAPP protected activity catchall provision].) As case law instructs, we do not concern ourselves "with the social utility of the speech at issue, or the degree to which it propel[s] the conversation in any particular direction." (*FilmOn,* at p. 151.) Rather, our focus is whether the speech or conduct "participated in, or furthered, the discourse that makes an issue one of public interest." (*Ibid*.) The alleged discussions in this case did just that.

Notably, as in the trial court, plaintiffs do not dispute that gender identity and related matters are issues of public interest. Nor do they dispute

---

[3] As required, we focus our attention on the particular allegations in this case, which convey personal pronoun introductions were combined with a gender identity lesson. We do not address, for example, whether simply introducing oneself and one's pronouns alone would sufficiently contribute to a public debate so as to fall within the scope of the anti-SLAPP statute.

the alleged discussions Pali's counselor's had with students, including plaintiffs, were in furtherance of free speech rights in connection with those issues. Instead, plaintiffs argue their claims against Pali do not arise from that activity and accuse Pali of mischaracterizing their claims and the allegations supporting them. They contend "the gravamen of [the] [c]omplaint is based on (a) [Pali's] lack of disclosure and (b) [Pali's] affirmative acts of preventing minors from contacting their parents."

Plaintiffs' argument is flawed in at least two respects: (1) it utilizes an incorrect gravamen approach to the protected activity analysis; and (2) it wrongly asserts their claims do not arise from the protected activity we have identified. We address each in turn.

Although at one time courts were applying a gravamen test in the first step of an anti-SLAPP analysis, the Supreme Court has made clear it is not the proper inquiry. (*Bonni, supra*, 11 Cal.5th at pp. 1009–1011.) Instead, we must first identify each claim for relief pled in the complaint, without being constrained by the way the complaint structures each cause of action. (*Id*. at p. 1010.) Once we identify "each act or set of acts supplying a basis for relief, of which there may be several in a single pleaded cause of action," we must determine whether each act or set of acts is protected. (*Ibid*.) If through this analysis it becomes clear a cause of action is a mixed cause of action, meaning "one that rests on allegations of multiple acts, some of which constitute protected activity and some of which do not," we disregard the unprotected acts and reach the second step of the anti-SLAPP analysis with respect to the claims arising from protected activity. (*Ibid*; see also *Baral v. Schnitt* (2016) 1 Cal.5th 376, 396 (*Baral*).)

Identifying the act or set of acts which supply a basis for relief, meaning the acts from which a claim arises, involves looking to the legally required elements of a cause of action. (*Bonni, supra*, 11 Cal.5th at p. 1015; *Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1063.) "'[T]he mere fact that an action was filed after protected activity took place does not mean the action arose from that activity for the purposes of the anti-SLAPP statute.'" (*Park*, at p. 1063.) Allegations which are merely incidental, collateral, or provide context, as opposed to supplying an element of a claim, may not be used as a basis for triggering anti-SLAPP protection. (*Bonni*, at p. 1012; *Rand Resources, supra*, 6 Cal.5th at p. 621; *Baral, supra*, 1 Cal.5th at p. 394.)

Plaintiffs' complaint pleads two tort based causes of action: IIED and NIED. The latter is not an independent tort, but rather a standard negligence claim. (*Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 985 (*Potter*); *Huggins v. Longs Drug Stores California, Inc.* (1993) 6 Cal.4th 124, 129.)

A. *The Intentional Infliction of Emotional Distress Cause of Action*

IIED has three elements: "'(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; [and] (3) . . . actual and proximate causation of the emotional distress by the defendant's outrageous conduct.'" (*Hailey v. California Physicians' Service* (2007) 158 Cal.App.4th 452, 474 (*Hailey*).)

Here, the IIED cause of action is generically pled, incorporating by reference factual allegations stated elsewhere in the complaint to supply, for example, the acts which plaintiffs claim were extreme and outrageous and

13

caused severe emotional distress. Those allegations include the following: "[p]arents were in no way informed that sexual matters or LGBTQ issues would be taught at Pali and their consent was not obtained"; "[w]hile present at Pali, . . . [plaintiffs] were introduced to camp counselors of unknown and ambiguous gender who identified themselves with 'they/them' third person pronouns and asked the students in attendance their 'preferred pronouns'"; the counselors "asked students to state their 'preferred pronouns' and taught students various matters pertaining to transgendered identification and sexual identity, all of which were of an age-inappropriate character, were not consented to by plaintiffs' parents and/or guardians and would not have been consented to, had parents been informed"; plaintiffs "requested to call their parents to discuss what had happened but were prohibited [by] camp personnel from doing so"; "Pali's policy prohibited students from calling home while at Pali." The focus of these allegations is the counselors' actions involving the gender identity subject matter, meaning those actions are at least part of the allegedly outrageous behavior on which the IIED cause of action is based.

Without citing or discussing any specific allegations of the complaint, plaintiffs argue their cause of action is solely grounded in two matters unrelated to any particular topic of camp discussions—a general lack of informed consent about subject matters to be taught at camp and Pali's policy of not allowing students to call home while at camp. We are not persuaded. First, a punitive damage related allegation within the IIED cause of action expressly asserts Pali's "subjection [of plaintiffs] to age-inappropriate content" was "intentional . . . and conducted in callous disregard of the rights of plaintiffs." The reference to the age-appropriateness

14

of the content, which is echoed elsewhere in the complaint, shows the content is not simply contextual. Second, the complaint is replete with allegations concerning the gender identity topic, none of which would have been necessary if they did not form the basis of plaintiffs' claims. Third, the complaint's introduction underscores that the gender identity discussions at camp are at least part of the basis of the wrongs being claimed. Specifically, it states plaintiffs' parents sent them to camp "based on the representation and belief that they would receive education consistent with the Western values with which they were raised at home," and says Pali "pulled a bait-and-switch[] [by] instead subjecting [plaintiffs] to instruction of a sexual character, focused on LGBTU [*sic*] issues with which [they] were unfamiliar and psychologically unprepared to process."

Other documents submitted by plaintiffs further support the notion the IIED cause of action is at least partially based on the gender identity related discussions. (See § 425.16, subd. (b)(2) ["court shall consider the pleadings, and supporting and opposing affidavits"]; *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 79–80 [relying on complaint, affidavits, and party's opposition to determine whether claims arose from protected activity]; *Mary's Kitchen v. City of Orange* (2023) 96 Cal.App.5th 1009, 1015 [at first step of anti-SLAPP analysis, court reviews pleadings, declarations, and other supporting documents to determine conduct being challenged].) The mother's declaration conveys details of what she refers to as a "forceful imposition of a gender identity lesson," says that lesson "intimidated and caused [plaintiffs] discomfort" because they "were completely unacquainted with the concept of preferred pronouns," and states "[t]he inappropriate lessons on gender identity were just the tip of the iceberg." Plaintiffs repeat those

15

characterizations in their appellate briefing. And, consistent with those statements, plaintiffs' opposition to the anti-SLAPP motion conceded some of the counselors' gender identity related communications "contributed to [p]laintiff's [*sic*] distress complained of," and their briefing on appeal asserts the "forceful imposition of a gender identity lesson intimidated and caused discomfort among the children, including [plaintiffs]."

Plaintiffs' recognition that some of the complained of emotional distress stems from the subject matter of the camp discussions undermines their argument that the failure to inform IIED claim is based on a general lack of disclosure. Severe and extreme emotional distress is an element of an IIED claim. (*Hailey, supra*, 158 Cal.App.4th at p. 474.) Because plaintiffs' alleged emotional distress is, at least in part, a result of the particular subject matter of which parents were allegedly not informed, the failure to inform claim arises from protected activity.

*Ratcliff v. The Roman Catholic Archbishop of Los Angeles* (2022) 79 Cal.App.5th 982, cited by the trial court and relied on by plaintiffs, is readily distinguishable. There, the plaintiffs sought to hold the defendants liable for alleged sexual molestation by a priest. (*Id.* at p. 988.) The complaint alleged the defendants condoned and ratified the priest's behavior, specifying the alleged ratifying acts and the alleged ways in which the defendants condoned the behavior. (*Id.* at pp. 1004–1005.) In concluding the plaintiffs' claims did not arise from litigation related protected activity identified by the defendants, the appellate court noted such activity was not among the list of alleged ratifying acts or the condoning allegations. (*Ibid.*) Thus, it explained, the allegations of litigation conduct were "simply incidental allegations that provide[d] context." (*Id.* at p. 1005.)

16

Here, the complaint does not limit the purported extreme and outrageous behavior to a specific list of acts. Rather, the complaint incorporates into the IIED cause of action all allegations in the paragraphs preceding it and then generically states "the actions of defendants, and each of them, as aforesaid, were intentional, extreme, and were done with the intent to cause emotional distress or with reckless disregard of the probability of causing plaintiffs emotional distress." Under these circumstances, unlike in *Ratcliff*, we must look to all other allegations in the complaint to determine the acts from which plaintiffs' IIED claims arise.

Although a fair interpretation of the complaint leads us to conclude there are IIED claims which arise from the gender identity related protected activity, it simultaneously confirms plaintiffs also appear to seek to impose IIED liability based on Pali's alleged policy of not letting students call their parents. Plaintiffs expressly represent that claim has no connection to gender identity related matters. And although not in the complaint itself, the mother's declaration raises the specter of harassment of the daughter. To the extent these claims—including any alleged emotional distress—are unconnected to the subject matter of anything that took place at camp, they do not arise from protected activity. Thus, they may not be stricken pursuant to the anti-SLAPP statue. (*Bonni, supra*, 11 Cal.5th at p. 1009.) Whether such claims are legally viable and, if so, whether plaintiffs will be able to demonstrate liability, are matters not before us and properly left for another day.

B. *The Negligent Infliction of Emotional Distress Cause of Action*

Turning to the NIED cause of action, the traditional negligence elements of duty, breach of duty, causation, and damages apply. (*Ess v.*

17

*Eskaton Properties, Inc.* (2002) 97 Cal.App.4th 120, 126.) The complaint alleges the duty of care Pali owed plaintiffs was "to ensure that plaintiffs were not exposed to foreseeable harms." It then identifies the following as reasonably foreseeable to result "in serious injurious consequences": "defendants' failure to disclose information about [c]amp counselors, sleeping arrangements, and age-inappropriate content of education." After alleging "[t]he acts and omissions of defendants constituted a negligent breach of [the aforementioned] duty," the complaint also sets forth the same punitive damage related allegation as in the IIED cause of action—"[d]efendants' failure to inform parents and subjection to age-inappropriate content have been intentional . . . and conducted in callous disregard of the rights of plaintiffs."

Once again, the references to age-inappropriateness demonstrate the alleged liability is based, at least in part, on the gender identity discussions which occurred at camp. Plaintiffs do not allege that exposure to any type of material without advanced notice to parents would foreseeably cause harm. Rather, they allege it was reasonably foreseeable that exposure to the gender identity material, which they characterize as age-inappropriate, would cause them harm, and, thus, Pali's act of exposing them to such material violated its duty to protect them from harm.

As for the allegations concerning sleeping arrangements and the failure to disclose information about camp counselors, Pali does not address whether an NIED claim based on either of those acts arises from protected activity. Thus, those allegations necessarily survive the anti-SLAPP motion. (*Bonni, supra*, 11 Cal.5th at p. 1009 [defendant bears initial burden of establishing allegations or claims arise from protected activity].) Whether

18

they amount to a legally viable claim, and, if so, whether plaintiffs will be able to demonstrate liability, are matters not before us and we express no opinion on them.

Having identified claims which arise from protected activity, namely IIED and NIED based on the exposure of plaintiffs to gender identity discussions, as well as IIED based on providing such exposure without first informing parents, we turn to the second step of the anti-SLAPP analysis.[4]

### III.
### STEP TWO: MINIMAL MERIT

The second step of the anti-SLAPP analysis requires evaluating whether a plaintiff has met its burden of demonstrating the claims which arise from protected activity are legally sufficient and factually substantiated. (*Baral, supra*, 1 Cal.5th at p. 396.) Plaintiffs contend they met their burden. On the record before us, we find otherwise.

At the summary-judgment-like second step of the anti-SLAPP analysis, the plaintiff may not merely rely on the complaint's allegations or argument from counsel. (*Billauer, supra,* 88 Cal.App.5th at p. 962; *Finton Construction, Inc. v. Bidna & Keys, APLC* (2015) 238 Cal.App.4th 200, 213.) Instead, a plaintiff must submit competent admissible evidence to demonstrate the requisite minimal merit of its claims. (*Billauer*, at p. 962.)

---

[4] The trial court did not reach the second step of the anti-SLAPP analysis. However, because our review is de novo, and the parties briefed and argued matters related to the second step below and on appeal, we engage in the step two analysis for the first time on appeal. (See *Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 468 [appellate court may decide step two of anti-SLAPP analysis even if trial court did not reach that step].)

19

We do not weigh evidence or resolve conflicting factual claims, but instead accept the plaintiff's evidence as true. (*Ibid.*)

Because evidence is the focus of the second step analysis, we first turn to an evidentiary dispute between the parties. Below, plaintiffs submitted a single declaration in conjunction with their opposition to the anti-SLAPP motion, that of the mother. Pali made various objections to it, with an emphasis on the mother's lack of personal knowledge which it believed rendered the matters conveyed inadmissible hearsay. The trial court sustained Pali's hearsay objection to the extent it was directed at "statements regarding the actions, statements, or thoughts of persons other than [the daughter]." At the same time, it overruled the objection with respect to "statements regarding the actions, statements, or thoughts of . . . [the daughter]." Citing *In re Emilye A.* (1992) 9 Cal.App.4th 1695 (*Emilye A.*), the court reasoned that information recounted by a minor to a parent is reliable and a "'firmly rooted' hearsay exception."

Pali argues the trial court abused its discretion in admitting any part of the mother's declaration, contending even the statements based on the daughter's communications to her mother are hearsay and not subject to any hearsay exception. Focusing on the parts of the declaration for which Pali's objections were overruled, we agree that most is inadmissible hearsay.

Among other matters, the mother's declaration described certain incidents that supposedly happened at camp, including interactions the daughter and others had with camp staff. It also relayed various purported impacts of the experience on the daughter, including the development of "a phobia of being alone" and the undermining of her faith in adults.

20

There is no dispute that the statements based on information conveyed by the daughter are hearsay. (See Evid. Code, § 1200 [defining hearsay].) However, plaintiffs contend the trial court properly admitted them because "the trial court correctly applied the standard from *Emilye A.*"

In *Emilye A.*, a child welfare case, the juvenile court admitted into evidence a written social study which included statements made by a minor to her mother. (*Emilye A., supra*, 9 Cal.App.4th at p. 1712.) In the context of an ineffective assistance of counsel argument, the father argued the hearsay should not have been admitted because the minor was incompetent to testify. (*Ibid.*) In considering potential prejudice from the claimed error, the appellate court assumed, arguendo, the minor was incompetent, and then concluded that, had minor testified, the evidence would have been admissible. (*Id.* at pp. 1712–1714.) It explained that "[s]tatements of a witness who is not competent to testify as a witness at trial may nonetheless be admissible if they are otherwise reliable under 'firmly rooted' exceptions to the hearsay rule." (*Id.* at p. 1712.) The court identified two hearsay exceptions that would have applied to the relevant statements by the minor—the spontaneous statement exception and the physical sensation exception. (*Id.* at p. 1713.)

Simply put, *Emilye A.* relied on two other firmly rooted hearsay exceptions. It did not, as the trial court in this case suggested, articulate a separate exception for statements made from a minor to a parent.

Seemingly recognizing that the trial court was mistaken about the law articulated in *Emily A.*, plaintiffs argue the challenged portions of the declaration are nevertheless admissible under the law actually pronounced in *Emily A.* In doing so, they state "[i]t is undisputed that [the daughter] is not

competent to testify at trial," and they argue "the statements [the daughter] spontaneously made to her mother explaining [the] humiliation and distress she was caused at science camp, days earlier, would qualify as an exception to the rule against hearsay." First, nothing in the record evidences the daughter's competency has ever been raised or discussed by the parties or the trial court. As Pali responds in its appellate briefing, plaintiffs' assertion of a lack of dispute "is wrong." Second, there is no foundation to establish the statements would qualify under the spontaneous statement exception. The context of statements is critical when considering that exception because its application is limited to statements "made under the stress of excitement and while the reflective powers were still in abeyance." (*People v. Washington* (1969) 71 Cal.2d 1170, 1176; see also Evid. Code, § 1240, subd. (b); *People v. Brown* (2003) 31 Cal.4th 518, 541 [crucial element in determining admissibility under spontaneous statement exception is mental state of speaker, not nature of statement].)

Plaintiffs do not identify any other hearsay exception that might apply, and we cannot conceive of one. (See *People v. Mataele* (2022) 13 Cal.5th 372, 413 [proponent of hearsay testimony has burden of establishing foundational requirements for its admissibility under hearsay exception].) Accordingly, the trial court erred in overruling Pali's objection to the statements in the mother's declaration which were based on information she obtained from the daughter.[5]

---

[5] A few parts of the mother's declaration communicated what appear to be the mother's own observations. They include the following portions of the declaration identified in Pali's objection numbers 18, 19 and 20: "[u]pon her return home, the negative effects of the camp experience on [the daughter] were glaringly evident"; "[s]he opted to sleep in bed with my

22

Without admissible evidence of Pali's alleged conduct and plaintiffs' alleged emotional distress, plaintiffs necessarily fail to demonstrate the minimal merit of their claims. Therefore, the trial court erred by failing to grant the anti-SLAPP motion with respect to the claims which we identify as arising from protected activity.

Even if we assumed, arguendo, plaintiffs produced admissible evidence to factually substantiate their claims, the claims would not be legally sufficient given California's public policy concerning gender identity.

The tort of IIED applies only to outrageous conduct. "Outrageous conduct has been defined as conduct that is 'so extreme as to exceed all bounds of that usually tolerated in a civilized community' [citation] and 'so extreme and outrageous "as to go beyond all possible bonds [*sic*] of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."'" (*Bogard v. Employers Casualty Co.* (1985) 164 Cal.App.3d 602, 616; see also *Potter, supra*, at p. 1001.)

Whether conduct qualifies as outrageous is usually a question of fact, but a court may determine in the first instance whether, as a matter of law, alleged conduct may reasonably be regarded as so extreme and outrageous as to allow the matter to proceed to a trier of fact. (*Berkley v. Dowds* (2007) 152 Cal.App.4th 518, 534; *Trerice v. Blue Cross of California* (1989) 209 Cal.App.3d 878, 883.) And, in the negligence context, the question of duty is a threshold issue of law for the court. (*Avila v. Citrus Community College Dist.* (2006) 38 Cal.4th 148, 161 (*Avila*).)

husband and myself for over a month"; [t]herapy sessions with her grandfather, a professional therapist, were initiated to help her deal with her trauma." Pali has not shown the trial court abused its discretion in overruling the objections to those parts of the declaration.

Based on our protected activity analysis, the alleged conduct which we must evaluate here is the exposure of 10 and 11 year olds to gender identity related discussions in a public school setting and the provision of such exposure without parents first being informed. Plaintiffs provide no argument or legal authority explaining how such conduct could be sufficiently outrageous to support an IIED cause of action, or how, under the circumstances, a duty exists that could support an NIED claim. In contrast, we find existing California public policy precludes such potential liability.

"A tort is 'a civil wrong, other than a breach of contract, for which the law will provide a remedy in the form of an action for damages.'" (*Nagy v. Nagy* (1989) 210 Cal.App.3d 1262, 1269.) The law, however, does not provide a remedy for all perceived human wrongs. In some instances, courts have concluded that allowing a remedy in tort would be contrary to public policy. (*Dale v. Dale* (1998) 66 Cal.App.4th 1172, 1184; see also *Rowland v. Christian* (1968) 69 Cal.2d 108, 112–113 [public policy is factor in determining existence of duty]; *Avila, supra*, 38 Cal.4th at p. 160 ["The existence of ""[d]uty' is not an immutable fact of nature ""but only an expression of the sum total of those *considerations of policy* which lead the law to say that the particular plaintiff is entitled to protection"""""].)

As Pali points out, the California legislature has made clear its position that gender identity is a characteristic to be protected and safeguarded, and discrimination based on it should not be tolerated in schools or otherwise. (See, e.g., Civ. Code, § 51 [prohibiting discrimination based on, inter alia, gender identity or expression in all business establishments]; Gov. Code, § 12920 [declaring public policy of state to protect right of all people to seek, obtain, and hold employment without being subject to discrimination

24

based on, inter alia, gender identity]; *id.* at § 12940, subd. (a) [prohibiting employers from discriminating based on, inter alia, gender, gender identity, or gender expression]; Ed. Code, § 219 (a) [requiring state superintendent of schools to convene advisory task force to recommend "supportive policies and initiatives to address LGBTQ+ pupil education and well-being" through, inter alia, inclusive and safe access to school facilities, inclusive curriculum, and prevention of bullying and harassment]; *id.* at § 220 ["[n]o person shall be subjected to discrimination on the basis of . . . gender, gender identity, [or] gender expression" in state funded educational institution]; *id.* at § 221.5, subd. (f) [mandating schools permit students to participate in activities consistent with their gender identity]; Pen. Code, § 192, subd. (f) [prohibiting murder provocation defense based on discovery of victim's actual or perceived gender, gender identity, or gender expression.]) Construing conduct which consists of engaging in gender identity discussions aimed at establishing a more inclusive school environment as outrageous or a breach of a duty of care would run directly counter to that established state policy.

Because the claims arising from the gender identity related protected activity are neither factually substantiated nor legally sufficient, they must be stricken from the complaint. (*Baral, supra*, 1 Cal.5th at p. 396.) As plaintiffs represent, and as we previously concluded, the remaining claims—IIED based on Pali's alleged policy of not allowing students to call home while at camp, as well as NIED based on sleeping arrangements and the failure to disclose information about camp counselors—do not rely on the gender identity related protected activity and, therefore, shall not be stricken from the complaint.

## IV.

### ATTORNEY FEES

Plaintiffs challenge the trial court's denial of their request for attorney fees under section 425.16. They acknowledge a plaintiff who defeats an anti-SLAPP motion may only recover attorney fees and costs if the court finds the motion was frivolous or solely intended to cause unnecessary delay (§ 425.16, subd. (c)(1)), but they argue the court abused its discretion in concluding Pali's motion met neither of those criteria. In light of our partial reversal which confirms Pali's motion had partial merit, the motion was not frivolous, and we affirm the attorney fees portion of the court's order.

### DISPOSITION

The order denying Pali's anti-SLAPP motion is affirmed in part, and reversed in part. On remand, the trial court is directed to vacate its prior order denying the anti-SLAPP motion, and enter a new order that does all of the following: (1) grants the motion as to the IIED and the NIED claims which arise from allegations concerning gender identity related activity; (2) denies the motion as to all other claims; (3) strikes paragraphs 1 through 5, inclusive, paragraph 16, lines 13-14 (only from "LGBTQ" through "Trails"), paragraph 20 (the second and third sentences only), paragraph 22, the last clause of paragraph 23, line 11 (only "who identified with they/them pronouns"), paragraph 34, paragraph 37, line 19 (only "age-inappropriate content of education"), and paragraph 40 of the complaint; and (4) denies plaintiffs' request for attorney fees pursuant to section 425.16. Pali is entitled to costs on appeal.

DELANEY, J.

WE CONCUR:

MOTOIKE, ACTING P. J.

SANCHEZ, J.

DELANEY, J., Concurring.

Having authored the majority opinion, I also write separately to express additional thoughts concerning the legal sufficiency of plaintiffs' intentional and negligent infliction of emotional distress claims that arise from gender identity related protected activity. I believe the liability they seek to impose is legally unavailable for reasons beyond a mere conflict with state legislative policy.

As aptly stated by another court in declining to allow a winemaker's defamation claim grounded in a comedian's alleged insinuation that the winemaker's wines were popular with African Americans, "[c]ourts will not condone theories of recovery which promote or effectuate discriminatory conduct." (*Polygram Records, Inc. v. Superior Court* (1985) 170 Cal.App.3d 543, 557 (*Polygram*), citing *Palmore v. Sidoti* (1984) 466 U.S. 429, 433 (*Palmore*).) Stated differently, "the law cannot, directly or indirectly, give [private biases] effect." (*Palmore,* at p. 433.)

Opening the door to emotional distress tort liability based on school setting discussions of gender identity aimed at establishing a more inclusive school environment would cast a dark shadow over a matter through which people seek to express their subjective, deep-core sense of self. (See *Grimm v. Gloucester County School Bd.* (4th Cir. 2020) 972 F.3d 586, 594 [describing gender identity as person's "'deeply felt, inherent sense' of their gender"].) It would convey a message of intolerance of those perceived as different, and it would work to foster discriminatory attitudes towards them.

As history teaches us, even though such biases may nevertheless persist in society, the law simply cannot give effect to them. (See, e.g., *Palmore, supra*, 466 U.S. at pp. 433–434 [potential pressures and stress on

1

minor child from living with stepparent of different race due to private racial and ethnic biases may not factor into custody determination]; *Shelley v. Kraemer* (1948) 334 U.S. 1, 20–23 [declaring judicial enforcement of real property racially restrictive covenants unconstitutional]; *Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1216–1217 [refusing to recognize tort based duty of landlord because doing so would likely result in arbitrary discrimination on basis of various protected characteristics]; *Polygram, supra*, 170 Cal.App.3d at p. 557 [refusing to recognize defamation theory that would effectively promote racially discriminatory ideas]; *Simmons v. American Media, Inc.* (Super. Ct. L.A. County, 2017, No. BC660633) [concluding mislabeling person as transgender cannot constitute libel per se and refusing to validate private prejudices against transgender individuals by legally recognizing them]; *Greenly v. Sara Lee Corp.* (E.D.Cal. April 30, 2008, No. CIV. S–06–1775 WBS EFB) 2008 U.S.Dist. Lexis 35472 [statements wrongly labeling coworker as homosexual cannot be defamatory per se and concluding otherwise would demean lives of homosexual persons]; *Albright v. Morton* (D.Mass. 2004) 321 F.Supp.2d 130, 138–139 [analogizing evolution of societal views of homosexuality with that of race and concluding wrongfully identifying someone as homosexual cannot be defamatory per se].)

The importance of adhering to this fundamental principle, which courts across the country have applied for the greater part of a century, cannot be underscored enough under the circumstances. "[F]oster[ing] an environment of inclusivity, acceptance, and tolerance . . . serve[s] an important educational function for [all] students. When a school promotes diversity and inclusion, 'classroom discussion is livelier, more spirited, and simply more enlightening and interesting [because] the students have the

2

greatest possible variety of backgrounds.' Students in diverse learning environments have higher academic achievement leading to better outcomes for all students. . . . [A]nd[,] inclusive classrooms reduce prejudices and promote diverse relationships which later benefit students in the workplace and in their communities." (*Doe v. Boyertown Area School Dist.* (3d Cir. 2018) 897 F.3d 518, 529, fns. omitted; accord *Grutter v. Bollinger* (2003) 539 U.S. 306, 330.)

I would find plaintiffs' claims arising from protected activity to be legally nonviable for this additional, critically important reason.

DELANEY, J.

3